THE PEOPLE OF THE STATE OF NEW YORK, Respondents, *v.* DANIEL DEVLIN, Chamberlain of the City and County of New York, Appellant.

Where a bill has passed both branches of the legislature, and has been signed by the appropriate officers, and sent to the governor for his approval and signature, it has passed beyond the control of either house, and cannot be recalled except by the joint action of the two houses.

Where a bill thus passed by the two houses, signed by the speakers and sent to the governor for his signature, is recalled by the action of one house alone, and the governor complies with the request, and sends back the bill, any action which such house may have in respect thereto, is a nullity.

Such bill, as passed by the joint action of the two houses, signed by their speakers, approved by the governor, and deposited in the office of the secretary of state, becomes the law of the State, notwithstanding any action either house alone may take in respect thereto.

*It seems,* that the courts cannot, for the purpose of impeaching a statute, go behind the records to inquire into the regularity of the proceedings of the legislature in passing such act.

THIS action was brought by the attorney-general to recover for moneys in the hands of the defendant, which, it is claimed, the defendant, by law, ought to have paid over to the State treasurer.

The defendant claims to hold the moneys in question as his commissions and fees as chamberlain of the city and county of New York. The action was tried before the Hon. A. S. JOHNSON, as sole referee, who reported thereon as follows:

That he finds and decides, as matter of fact, that during the year 1863, between 7th day of August and the 24th day of December, there came to the hands of said defendant, he being then the chamberlain and county treasurer of New York, the sum of $2,139,425.44; that said sum so came to his hands as the product of the State taxes levied within the city and county of New York, under and in pursuance of laws enacted and existing prior to the first day of January, 1863, and that the said moneys were not, nor was any part thereof, levied for, or as part of the taxes imposed by the act of the legislature, chapter 393, of the Laws of 1863, passed May 4, 1863, and that it was the duty of the said defendant

to pay into the treasury of the State the whole of the said sum, after first deducting and retaining such part thereof as he was entitled to deduct and retain as and for his lawful compensation in that behalf.

That the said defendant afterwards paid over to the treasury of the State of New York, 2,118,030.02, and retained the sum of 21,394.40, which he claimed to be the amount of his lawful compensation in that behalf; that prior to the passage of the act above referred to, chapter 393 of the Laws of 1863, passed May 4, 1863, the chamberlain and county treasurer of New York was entitled to deduct and retain one per cent of the amount of State taxes in his hands to be paid into the State treasury, as and for his lawful compensation in that behalf.

And he further finds and reports, either as matter of fact or as matter of law, as it may appear to the court, that there is of record in the office of the secretary of State of the State of New York, an act of the legislature, of which chapter 393 of the Laws of 1863, in the printed laws of that year, is a copy, on which record is an indorsement signed by the secretary of State, who held that office during the year 1863, in the words following:

"STATE OF NEW YORK, }
OFFICE OF THE SECRETARY OF STATE. }

This act having been approved and signed by the governor, on the 4th day of May, 1863, I hereby certify that the same became a law on that day.

HORATIO BALLARD,
*Secretary of State.*"

That from the journals of the senate and assembly for the year 1863, it appears that a bill in terms agreeing with the said chapter 393, was on the 17th day of April, 1863, read a third time in the assembly and passed, three-fifths of all the members being present, and ordered to be sent to the senate.

That in the senate, on the 22d day of April, the said bill from the assembly was passed without amendment, three-fifths of all the senators being present, and was ordered to be returned to the assembly, and that the same was so returned,

and that, thereupon, on the same day, the said bill was sent by the assembly to the governor. That, on the 23d day of April, the assembly requested the governor to return the said bill to the assembly. That, on the same day, the governor returned the said bill to the assembly, with a message stating that it was so returned upon the request of the assembly. That upon the return of the said bill, the assembly resolved that the fifth section of the said bill be struck out; and the bill was then, the said section being so struck out, read again and passed, three-fifths of all the members being present, and ordered to be sent to the senate with a message accordingly.

On the 24th day of April, the senate having received from the assembly a message, informing the senate of the said action of the assembly, resolved not to concur therein, and ordered the bill to be returned to the assembly with a message to that effect, and with the information that the senate had appointed a committee of conference on the subject.

Afterwards, on the same day, the assembly having received the said message from the senate, resolved to adhere to its previous action, and ordered the bill to be returned to the senate, with a message informing the senate of the said action of the assembly.

Afterwards, on the same day, the senate having received the said bill and message from the assembly, resolved that the bill should be returned to the assembly, with a message, informing the assembly that as the bill had passed both houses and been sent to the governor, it was, in the judgment of the senate, beyond the control of either house without the consent of the other, and that the senate declined taking any further action in regard to it. Afterwards, on the same day, the assembly having received the said bill and the said message from the senate, rescinded their resolution to adhere, and appointed a committee of conference, and informed the senate of their action in the premises, and returned the bill to the senate, with the message giving such information.

Afterwards, on the same day, the committee of conference reported to the senate and assembly a recommendation that

the bill should be sent again to the governor, with the cross marks which had been drawn across the fifth section erased, for his signature.

The senate thereupon, on the same day, resolved, according to the said recommendation of the conference committee, and ordered the bill to be returned to the assembly with the message accordingly.

The assembly thereupon, on the same day, on the return of the bill and the report of the conference committee, non-concurred in the report, and appointed another committee of conference.

On the 25th day of April, the senate resolved to send a message to the assembly, asking that the bill should be returned to the senate.

That no further action was had, or order made, by either the senate or assembly, in respect to the said bill or act, so far as is proven by the journals of the senate and assembly.

That upon the matters before set forth, the referee determined and decided, as matter of law, that the defendant had no right to receive for his compensation, or otherwise, a greater sum than the sum of $2,000, and he therefore decides that the defendant ought to pay to the plaintiffs the balance of the sum retained by him, after deducting therefrom $2,000, together with lawful interest on such balance, from the 1st day of May, 1864, to the date of the report, being of principal $19,394.24, and of interest 1,206.75, which sums, in the whole, amount to $20,600.99, for which sum judgment was directed to be entered in favor of the plaintiffs against the defendant.

*John Cochrane*, Attorney-General, for the People.

*John E. Devlin, John H. Reynolds* and *Waldo Hutchins*, for the defendant.

Potter, J. There is no constitutional objection to the power of the legislature to regulate the compensation of county treasurers, or that of the chamberlain of the city and county of New York. The same power has been before

exercised by the legislature. (See Act of 1846, ch. 189.) The compensation may be increased or diminished in regard to future services, according to the legislative will. The services for which compensation is claimed, in this case, were performed subsequent to the passage and taking effect of the act of the legislature in question (if it be an act). The holding of the office of chamberlain at a fixed compensation at the time of the passing an act, created no vested right in the incumbent to hold it, subject to the same compensation for the future portion of his term of office. The law under which he entered upon his duties is not a contract, express or implied, on the part of the State, that the same compensation will continue. Nor is an act changing the compensation of such an officer an *ex post facto* law. The act of the legislature of May 4, 1863, ch. 393, requires county treasurers, on or before the first day of April in each year, to pay to the treasurer of the State the amount of State tax raised and paid over to them respectively, retaining the compensation to which they may be allowed. This act took effect, if at all, the 24th of May, 1863. The moneys in question came to the defendant's hands after August of that year. By article 4, title 2, part 1, ch. 8, of the Revised Statutes, § 101 (29), the chamberlain of the city and county of New York shall be considered county treasurer thereof, and all the provisions of that article which apply to county treasurer shall be held to apply to him. The fifth section of the act of 1863, in terms, authorized county treasurers to retain the compensation allowed by law, at the time this act took effect, but restricted them to a sum not in any case to exceed the sum of two thousand dollars. We are not called upon to say whether the sum of $2,000 is or is not a sufficient compensation for receiving from the collectors above $2,000,000, and transferring it over to the State treasurer, but only to decide whether the law now allows him, as such treasurer, a greater compensation than $2,000.

In many counties of the State the receipt and payment over of a larger amount of money adds nothing to the compensation of county treasurers. By an act of the legislature

of 1846, ch. 189, it was provided that the several county treasurers of this State should thereafter receive for their services, instead of the fees then allowed by law, such compensation as should be fixed by the respective boards of supervisors of their respective counties, in no case to exceed the sum of $500 per annum. In some counties the boards of supervisors took action upon this statute, in other counties they did not. Where they did not, as was doubtless the case in the city and county of New York, the former provision contained in the Revised Statutes applied, which was as follows: "The county treasurer shall be entitled to retain a commission of one per cent on every dollar which he shall receive and pay, to wit, one-half of such commission for receiving and the other half for paying." (1 R. S., 370, § 92 [26].)

If, then, the fifth section of the act of 1863 was a law of the State of New York, when the funds in question came into the hands of the defendant, and when he paid over the amount which he did pay to the State treasurer, then the judgment below is right; otherwise, it should be reversed. This is the only and single question that remains.

As evidence that the act in question, including the said fifth section, is a law of the State, there was produced on the trial the record of such an act from the office of the secretary of State of the State of New York, on which record is an indorsement, signed by the secretary of State who held the office during the year 1863, in the usual form, certifying that the act had been approved and signed by the governor on the 4th day of May, 1863, and the further certificate of said secretary that the same became a law on that day. In the printed volume of the laws of that year is a copy of the said act; the volume from which the statute was read is certified in like manner by the secretary of State. By the statute of this State of 1846, ch. 24, it is provided that "all laws passed by the legislature may be read in evidence from the volumes printed under the direction of the secretary of State. The evidence, therefore, of the existence of such a statute, was produced on the part of the people. By the Revised Statutes,

vol. 1, 157 (marg. paging), section 10 requires that the sec-
retary of State shall receive every bill which shall have
passed the senate and assembly, and been approved and
signed by the governor, &c., and shall deposit such laws in
his office.  By section 11 he is required to certify and indorse
upon every such bill, the day, month and year when the
same so became a law, and such certificate shall be conclusive
evidence of the facts therein declared.

To impeach this record the journals of the senate and
assembly were introduced, which showed the action had
upon the said bill, in those two houses, to be as contained
in the report of the referee.  And the question that first
arises upon this showing is, can a legislative act, so certified,
be impeached by the journals of the two houses?  To deter-
mine this we may resort to the Constitution, the statute, and
to the common or parliamentary law.

By the provisions of the present Constitution, the common
law of the colony of New York and acts of its legislature as
they existed on the 19th April, 1775, and the acts of the
legislature in force at the making the Constitution, were made
the law of the State. (Art. 1, § 17, Const. 1846.)  "The legis-
lative power of the State shall be vested in a senate and
assembly." (Art. 3, § 1.)  "A majority of each house shall
constitute a quorum to do business, and each house shall de-
termine the rules of its own proceedings." (Art. 3, § 10.)
"Each house shall keep a journal of its proceedings and pub-
lish the same, except such parts as may require secrecy." (Art.
3, § 11.)  "Any bill may originate in either house of the legis-
lature, and all bills passed by one house may be amended by
the other." (Art. 3, § 13.)  "No law shall be enacted except
by bill." (Art. 3, § 14.)  "No bill shall be passed unless by
the assent of a majority of all the members elected to each
branch of the legislature, and the question upon the final
passage *shall be taken immediately* upon its last reading, and
the yeas and nays entered on the journal." (Art. 3, § 16.)
"Every bill which shall have passed the senate and assembly
shall, before it becomes a law, be presented to the governor;
if he approve of it he shall sign it, but if not, he shall return

it with his objections to that house in which it shall have originated, who shall enter the objections at large on their journal, and proceed to reconsider it," &c. (Art. 4, § 9.) "On the final passage in either house of the legislature of every act which imposes, continues or revives a tax, or creates a debt or charge, or makes, continues or revives any appropriation of public or trust money, or property, or releases, discharges or commutes any claim or demand of the State, the question shall be taken by ayes and noes, which shall be duly entered on the journals, and three-fifths of all the members elected to either house shall, in all such cases, be necessary to constitute a quorum therein." (Art. 7, § 14.)

The foregoing are all the constitutional provisions in regard to the performance of duties by the legislature, necessary to the passage of acts, in order to constitute them valid laws. The journals introduced show, if they are legal evidence, that three-fifths of all the members present, in both houses, voted for the bill in question. The bill was read a third time in the assembly, the house in which it originated, on the 17th day of April, 1863, and was ordered by them to be sent to the senate. On the 22d day of April, 1863, the bill was passed in the senate, without amendment, by three-fifths of all the senators present, and ordered to be returned to the assembly; and on the same day, the same was so returned; and also, on the same day, the assembly sent the said bill to the governor. Thus far, all the constitutional requisites to pass the bill had been performed, by the two houses of the legislature. To make it a law, required but the signature of the governor, which it subsequently received. By the provisions of both the Constitution and the statutes, to which we have referred, this bill, upon this evidence, became the law of the State. All that further appears by the journals of the two houses, in relation to this bill, raise this question: After the passage of a bill in the legal and constitutional form, by both houses of the legislature, and the same has been transmitted by them to the governor, in the manner provided by the Constitution, have the two houses exhausted their power over it, or can they, or can either of the said

houses, without the consent of the other, recall the bill, by
resolution, and revest themselves with power further to act
upon it? If they do possess the power, it is not found in
the Constitution; it is not found in the statute; it is not
shown to be the custom or usage. Although each house
shall determine the rules of "its own proceedings," no rule
for such a proceeding as that of sending for a bill in the pos-
session of the governor, has been shown to exist; besides,
the bill at that time, had become the act of both houses, and
neither had then any further control over it. The act of
courtesy of the governor in returning to the assembly the
bill, at their request, conferred no power upon the house of
assembly to act further upon it. Even if the governor had
intended to allow them so to act (as by his subsequently sign-
ing the bill in the form he first received it, it seems he did
not), it is still a question of power. No authority is shown
to be possessed by the governor to perform such an act, as a
part of the law making power. If the assembly possessed
the power of recalling bills from the governor, after being
passed by both houses and sent to him, it is not found in
parliamentary law, and no custom of that kind is shown. If
we may take judicial notice of parliamentary law, as con-
tained in the rules of the assembly, made under the constitu-
tional provision for that purpose, and published by them in
the session of 1863, no such rule, or custom, or law is found.
According to those rules (rule 43), the question upon the
*final* passage of a bill shall be immediately after the third
reading. So the vote was taken in this case. There can be
but one *third* reading of a bill and but one "*final* passage,"
in either house. This bill had received such third reading
and had its *final* passage in both houses, before being sent to
the governor. It having passed the senate without amend-
ment, the assembly then had no power to amend it, by any
rule or custom of legislation. When both houses have thus
finally passed a bill and sent it to the governor, they have
exhausted their powers upon it, except the power of sending
it to the governor, by the house in which it originated,
according to parliamentary law. By rule 51 of the assem-

bly (Red Book of 1863, page 493), it is provided that "no motion for reconsideration of any vote shall be in order, unless on the same day, or the following legislative day to that on which the decision proposed to be reconsidered, took place." No evidence is produced of a compliance with this positive law of the assembly, after the final passage of the bill before mentioned, and after receiving it back from the governor. When express rules have been adopted by such a body, by which to govern their action in this respect, we must exclude the consideration that their action was exercised under some implied power, not clearly shown. They could only act further upon this bill by reconsidering their action according to *their* law of action. The subsequent action of the assembly, as also that of the senate, in attempting to resuscitate this bill, and to give it vitality, in their or in either of their bodies, was unauthorized and unusual, and it resulted in no agreement between the two houses. By no rule or custom shown, or by the exercise of common reason, could one house, by their action, undo, annul or change what both had solemnly done under their solemn legislative sanction, according to all constitutional forms, and according to their published rules and forms of law. If, then, these legislative journals, so introduced as evidence, could be regarded as legal evidence to impeach or annul a statute so duly certified and published, taken in connection with their own published rules, they would still fail of being sufficient to effect that object.

There is no doubt that each house of the legislature, by virtue of the constitutional provisions we have cited, and perhaps inherently, have power to determine for itself rules and orders to govern them in the various stages of legislation, and in relation to all matters relating to the exercise of their rights, powers and privileges. When such rules or laws have been established by them, as they were in this instance, they become the law of that body for such purpose, and are binding upon them as the law to govern them in such proceedings; and this is called parliamentary law. (2 Salk., 503; 2 Lord Raym., 1105.) And when they have established such

rules, and they thus become the law for such purpose, they cannot themselves arbitrarily depart from such law, and conduct their proceedings by other rules not known to or adopted by such body. And, though acts of the legislature signed by the governor, not in conflict with the Constitution, may be omnipotent in this regard to overcome violations of parliamentary law in producing their passage, it is quite clear that anything short of an act of the legislature can work no such effect as to legalize a breach of their rules.

I am of opinion that the legislative journals were not legitimate evidence to impeach the statute produced. They are not made evidence by the Constitution; they are not made so by the statute; they were never made so at common law. They are, doubtless, evidence, from the necessity of the case, on grounds of public convenience and from the public character of the facts they contain, to prove the proceedings of the body whose records they are, because the Constitution requires them to be kept. Whenever any act or proceeding of such a body becomes necessary to be shown as evidence, such journals may be received; but to impeach the force and effect of a solemn statute duly certified, no authority can be found within the limits of my research to admit them to be legitimate evidence, but much authority may be found to the contrary.

In the case of *Eld* v. *Gorham* (20 Conn., 16), it was held upon provisions of statutes, and the method of authenticating them similar to those of our statutes, as follows: "When the legislature constituted a certified copy of an act, an authentic record of the statute laws of the State, it has the same force and effect as if it were in truth a portion of the original records, as to its constituting evidence of what is stated in it. As such, it imports absolute verity, is, in itself, conclusive evidence of what it states." "It can neither be contradicted nor varied as to any of the facts of which it professes to be the memorial, and no evidence is admissible, because it would be unavailing for that purpose."

In the case of *Fletcher* v. *Peck*, reported in 6 Cranch, 131 (6 Cond., 308), Chief Justice MARSHALL held, that "in a con-

test between two individuals claiming under an act of the legislature, the court cannot inquire into the acts and motives which actuated the members of that legislature. If the legislature might *constitutionally* pass such an act, if the act be clothed with all the requisite forms of law, a court sitting as a court of law cannot inquire into the motives by which law was produced."

A few cases are found in our reports, in which the courts have gone so far as to examine whether certain acts have been constitutionally passed, that is, whether the legislature have power to pass the act in question, as when the Constitution requires that two-thirds of all the members elected to vote for an act. So held in *Thomas* v. *Dakin* (22 Wend., 9), and in the case of the *People* v. *Purdy* (2 Hill, 31), BRONSON, J., held, that when the point is raised whether a two-thirds act was passed as a majority bill only, *the court* may look beyond the printed statute book; and if the *original* engrossed bill on file in the office of the secretary of State is not certified *pursuant to the statute* as having passed by a two-thirds vote, this is at least *prima facie* evidence of the contrary being the fact."

In *Warner* v. *Beers* (23 Wend., 125), Chancellor WALWORTH said: " I have very little doubt that this court (the court of errors), is not authorized upon this demurrer to the plaintiff's declaration, to look beyond the printed statute book for the purpose of ascertaining whether the law of April, 1838, was passed by a two-thirds vote, or merely as a majority bill, if indeed a court is authorized in any way, to institute an inquiry into the mode in which a law signed by the governor and duly certified by the secretary of State, was passed." In the same case VERPLANK, Senator, after an examination of English common law authority, page 133, says: " The statute must be its own evidence, and cannot be rebutted." And BRADISH, President, said, page 171 : " I am clearly of opinion that the question whether this act of the legislature be a law is not a question of *fact*, to be tried by a jury, but one of law to be determined by the court only, and that by an inspection of the record. That record imports verity." " Its

truth cannot be determined by a proceeding *in pais*, but must be decided by itself on inspection. This opinion rests upon the highest authorities, both ancient and modern." (See also Dwarris on St., 629, 630, 632, 637; id., 28, 30; *Purdy* v. *The People*, 4 Hill, 390; *De Bow* v. *The People*, 1 Denio, 14; *King* v. *Jeffries*, 1 Str., 446; *King* v. *Robotham*, 3 Burr., 1472; *King* v. *Arundel*, Hob., 109; *The Prince's Case*, 8 Co., 145.) In *The Prince's Case* (reported in 8 Co., 145), *nul tiel* record was plead to an act of parliament, to which plea there was a demurrer. The demurrer was held good. And it was held, "that the words," by authority of parliament, "in an act or charter, are sufficient to make it an act of parliament, and that this constituted such an act, whereof the judges and all the kingdom ought to take notice."

Lord COKE (Co. Lit., 98, b), speaking of this act of parliament, says, "It is, among other acts of parliament, entered into the parliament roll, and, therefore, shall be intended to be ordained by the king by the consent of the lords and commons in that parliament assembled; and, thirdly, it is a general law whereof the judges may take knowledge, and, therefore, it is to be determined by them whether it be a statute or no."

COMYN, in his Digest, title, "Parliament," citing Lord COKE's authority, *supra*, says, "And, therefore, a man cannot plead to it '*nul tiel record*.' So, it shall not be proved by a journal." (Hob., 110.) "And if the journal of parliament be variant from the record it does no prejudice, for that is no record." (Id.) "So if by the roll it appears that the bill was sent to the lords by the commons, with a proviso annexed, and no proviso is extant upon the record, yet it shall be a good statute." (Id., 110, 111.) We have no common law in this country in conflict with this. It would be destructive not only of all public confidence, but would open a wide door for litigation, if our statutes, published by public authority, were liable to be annulled or impeached by issues of fact to be raised either of fraud in procuring their passage, or in lack of conformity to rule, by either house in the usual forms of enactment. If the defense interposed in this case, that no

such statute exists, can be made available, and such questions·
as questions of fact can be brought into the courts for trial,
an intolerable condition of legal uncertainty would result. ·
Such a case is unheard of; it is too dangerous in its conse-
quences to be entertained as an experiment. It is without
authority as a precedent. I have not been able to find any
error in the judgment that demands a reversal. I think the
judgment should be affirmed.

CAMPBELL, J. The defendant, as chamberlain of the city
of New York, received in 1863 over two millions of dollars
on account of the State tax. Over nineteen thousand dol-
lars, part of the sum, the defendant retained, claiming that
he was entitled to the same as fees or percentage on the
amount so received by him for the State. On the 4th day
of May, 1863, and before the receipt of the money above
mentioned, the legislature passed an act entitled "An act to
provide means for the support of the government, &c.,"
authorizing certain taxes to be levied and collected, and the
fifth section of which act, first clause, is as follows: "It shall
be the duty of the several county treasurers of this State, on
or before the first day of April in each year, to pay to the
treasurer of this State the amount of State tax raised and
paid over to them respectively, retaining the compensation
to which they may be entitled, and which compensation shall
not exceed the amount now authorized by law, and *shall not,
in any case, exceed the sum of two thousand dollars.*" The
rights of the parties depend on the validity and construction
of this section of the act of 1863, the defendant contending
that such act, and especially the fifth section, was not passed
by the legislature and did not become a law; that if
passed and a law of the State, the section was not intended
to and did not limit the compensation of the defendant for
the receipt and payment of moneys levied and collected
under tax laws enacted previous to May 4, 1863, and that
the money sought to be recovered had been paid in to him
under such former laws, and lastly, that the section did not
apply to him in terms as the chamberlain of the city of New
York.

Chapter 393, in the printed statutes of 1863, is an exact copy of the engrossed and signed bill on file in the office of the secretary of State, excepting certificates of the various officers. On that bill or record is the proper certificate indorsed, signed by the then secretary of State as follows: "This act having been approved and signed by the governor on the 4th day of May, 1863, I hereby certify that the same became a law on that day." It is the duty of the secretary of State to receive and deposit in his office every bill which shall have passed the senate and assembly, and which shall have been approved and signed by the governor. (1 R. S., p. 187, §§ 10, 11.) "He shall certify and indorse upon every such bill, the day, month and year when the same became a law, and such certificate shall be conclusive evidence of the facts therein declared." The fact that the bill has passed the senate and assembly is evidenced to the governor by the certificates of both the presiding officers of those houses, and then when the governor approves and signs the bill, and the same is deposited in the office of the secretary of State, and by him indorsed, the record is made up and completed, the bill has become an act, and the act has become one of the statute laws of the State. A serious question at once arises in this case, whether any court can go behind this record and determine whether any rule of parliamentary law has been violated.

The legislature, under constitutional limits, is the supreme law maker of the State. Within the Constitution the legislature is supreme, and when a law confessedly within the power of the legislature to make, comes down to the people, authenticated by the presiding officers of the respective houses, approved by the governor and certified and declared by the secretary of State to be the law of the State, no citizen, I think, in a private controversy, can call upon the courts to go behind the record thus made up and impeach the validity of the law, by showing that in its enactment some form or proceeding had not been properly followed or adopted by the legislature, the supreme law maker. The court decides what the law is, which the legislature has made, and enforces

it by its judgments and executions. As both legislature and courts are restricted by the Constitution, which is the *suprema lex*, when there is a violation of that supreme law by the law making power, the court may declare such violation, and refuse to enforce an unconstitutional law. But in such a case the court does not go behind the record to impeach the law, by showing the absence of forms or irregularity of proceeding by the law maker, but it compares the law sent down, with the Constitution, the higher law, and determines that the former is in conflict with the latter, and of consequence that the former is null and void. That the record itself may be inspected and examined, for some purposes, by the court, has been held by some of the most learned and able judges of the State. Thus, Mr. Justice BRONSON, in *The People* v. *Purdy* (2 Hill, 34), says: "It has not been denied that the judicial tribunals of the State may, in some way, look beyond the printed statute book for the purpose of ascertaining whether bills coming within *the two-thirds clause of the Constitution*, have received the requisite number of votes, and although I have felt a good deal of difficulty on that question, I am inclined to the opinion that such an inquiry may be instituted. The question is no doubt one of great delicacy, but if the courts have the right to entertain it, the duty is imperative, and we are not at liberty to shrink from its performance." In that case he says he had examined the original engrossed bill on file in the office of the secretary of State, and found it was certified by the presiding officers, in the usual form of a *majority* bill, and held that if not conclusive it was *prima facie* evidence that it could not be deemed to have been passed by the assent of two-thirds of the members elected to each house. But in such a case the legislature had declared its will and given its consent. 1 R. S., page 156, § 3, is as follows: "No bill shall be deemed to have been passed by the assent of two-thirds of the members elected to each house unless so certified by the presiding officer of each house." The record itself must show whether the law had been passed as a two-thirds law, and inasmuch as the printed statute book does not contain the whole

record, an inspection would become necessary, where the fact was in controversy. Such an inspection, for such a purpose, seems to me to be unobjectionable. But if that was a question of delicacy, how much more delicate does the question become when the court is called upon to go behind and beyond the record and inquire into the regularity of the proceedings of the legislature itself, and to declare that by reason of such irregularity, if found to have existed, the law is null and void. When the same case, *The People* v. *Purdy*, afterwards came before the court for the correction of errors, Mr. Senator Paige (4 Hill, 394), said: "We have a right, I think, to go behind the printed statute book in order to ascertain whether bills have been constitutionally passed. Judges who are bound to take notice of a public act must determine this question by an inspection of the record, for *nul tiel* record cannot be pleaded to a statute." Mr. Verplank, Senator, in *Warner* v. *Beers* (23 Wend., 135), says, among other things: "The inspection of the record, when judged necessary, has the sanction of the most venerable authorities and oldest usage of our common law," quoting Dyer and Coke, &c. In that same case Lieutenant-Governor Bradish, then president of the senate, said (23 Wend., 169): "But if all courts and officers called on to decide upon the validity or give effect to any act of the legislature, are not only at liberty but are even required to disregard that certificate (certificate of secretary of State), and to go behind it and inquire in what manner and by what vote the act was passed by the legislature, indeed in what manner it passed through all its various stages, until, *as a law* it was deposited in the office of secretary of State and thus became a public record, the evils which would necessarily result from such an interpretation can hardly be imagined. That certainty *as to what is the law*, which is so important to all, and which it has been the object of the statute to establish, would be at once destroyed and everything be thrown into doubt, for if this doctrine be once admitted as correct it is not readily perceived why it *may* not, indeed why it *must* not be extended to all legislative acts, as well

those which require for their passage the assent of only a majority of a quorum present, as those which require for that purpose the assent of two-thirds of the members elected to each branch of the legislature. This broad interpretation once admitted it would be as difficult to limit these inquiries as it would be to calculate their inconveniencies or compute their mischiefs. But what would be only *difficulties* within one State would be *impossibilities* out of it. If a State statute, why cannot an act of congress or a statute of another State be impeached in the same way. (See *Green* v. *Weller*, 32 Miss., 650; 23 Mo. [2 Jones], 353; and *Eld* v. *Gorham*, 20 Conn., 8.)

But if the court can go behind the record and inquire into the regularity of the proceedings of the legislature, then I am of opinion that this law was duly enacted according to the approved usages of legislative bodies and the established rules of parliamentary law. The law had its origin in the assembly. The bill was introduced and was considered in all its stages, and passed and sent to the senate for concurrence. It met the approval of the senate, and was passed by that house without amendment, and after such passage, was returned to the assembly, was signed by the presiding officers and sent to the governor. This was according to well established parliamentary usage and law. The legislature had declared its will. No further separate action was required or allowed. The streams issuing from senate and assembly fountains had flowed together and were now united in one. The united action of both houses would be necessary to recall the bill. In this case, however, the assembly, without the consent, and, as afterwards appeared, without the approval of the measure by the senate, sent a message to the governor, asking the return of the bill to the assembly. This was done by the governor probably as an act of courtesy, and without knowledge, on his part, that it was against the wishes of the senate. The assembly, on receiving the bill, struck out and erased the fifth section before referred to. The bill was again sent to the senate. That house refused to concur in the amendment, and resolved that, inasmuch as the bill had

passed both houses and been sent to the governor, it was, in the judgment of the senate, beyond the control of either house without the consent of the other, and that body declined taking any further action in regard to it. There were, however, committees of conference appointed, but there was no further agreement between the senate and assembly. The legislature adjourned on that day, and the clerk of the assembly prepared a new engrossment of the fifth section, and the bill was again sent to the governor, who signed it. The bill was thus restored to its original condition. In that form it had been passed by the legislature, and, by the approval of the governor, became a law. In this proceeding, on the part of the clerk, he performed his proper duty. In 1768 a bill which had originated in the house of commons and been passed by the house, was sent to and had been passed by the house of lords. The bill was presented by the house of lords to the king for his assent, without notifying the house of commons of the agreement, on the part of the lords, to the passage of the bill. It was conceded that this was an informality, but it was said it was a mere matter of ceremony, and did not affect the validity of the bill. "Lord Marchmont and Lord Sandys, both lords of great experience in parliament, replied that when both houses had passed a bill, it was not in the power of any person to withhold it from being offered for the royal assent, or (as they expressed themselves) to take it off the table." (Hatsell's Precedents, Lond. ed., 1796, 2d vol., p. 320), and on page 321, note, it is said, referring to proceedings in 1794, "indeed I suppose that when both houses have passed a bill, it is not in the power of the clerk of the house of lords to withhold inserting it amongst those that are offered for the royal assent, without an express order of the house; and if the lords should give such an order, without sufficient reason, it would be an infringement of the rules of parliament." This bill had passed both houses and been sent to the governor for his approval. The recall by the assembly was an infringement of parliamentary law. It was an attempt to do alone what, if it could be done at all, required the joint action of both senate and assembly. All

subsequent proceedings by the assembly were irregular and of no effect, and when there was a failure to procure the assent of the senate to an amendment, it was, I think, the duty of the assembly to return the bill to the governor. Failing to do this during the session, the duty devolved on the clerk. These remarks are only intended to show what is believed to be well settled parliamentary usage and law. The resolve of the senate that the matter had passed beyond separate control was, I think, clearly right. If we were permitted to go beyond the record, therefore, it would not vary the decision in this case.

The question whether the fifth section of the act of 1863 applies to the chamberlain of the city of New York, is answered by a simple quotation of part of section 101. (1 R. S., 5th ed., p. 865.) "The chamberlain of the city and county of New York, shall be considered the county treasurer thereof." The article of which that section is a part relates to the county treasurers, and as far as relates to the duties of the chamberlain in receiving and paying over the moneys of the State, he is clearly a county treasurer. The law says he is "considered the county treasurer." If he is so *considered* in the statute, it would be absurd to say he is not the county treasurer. If the defendant is chamberlain in his dealings with the city of New York, he certainly is county treasurer in his dealings with the State.

The fifth section of the act is general in its terms and requires the treasurers to pay over the State tax raised and paid to such treasurers, not the State taxes to be levied and collected under and by virtue of the law of 1863, but all State taxes that may come into their hands. The taxes in question came into the hands of the defendant some time after the act of 1863 became a law. The defendant had no vested interest in the emoluments of his office which the legislature could not affect. The prospective salary or emoluments of a public office are not property, and may be increased or reduced by law at all times, except in the cases where the Constitution has forbidden it. (*Connor* v. *The Mayor*, 1 Seld., 285.) There is no constitutional provision forbidding

the legislature interfering with the percentage to be charged or the emoluments to be received by the county treasurer of New York.

In my opinion the judgment is right and ought to be affirmed.

In which all the judges concurred.

Judgment affirmed.