94 N.Y.2d 577 (2000)
730 N.E.2d 920
709 N.Y.S.2d 122
CITY OF NEW YORK et al., Appellants,
v.
STATE OF NEW YORK, Respondent.
THOMAS J. IGOE, JR., et al., Individually and on Behalf of All Others Similarly Situated, Respondents-Appellants,
v.
GEORGE E. PATAKI, as Governor of the State of New York, et al., Appellants-Respondents.
LARY S. WOLF et al., Respondents-Appellants,
v.
STATE OF NEW YORK et al., Appellants-Respondents.
CHARLES QUINN et al., Individually and on Behalf of All Others Similarly Situated, Respondents-Appellants,
v.
GEORGE E. PATAKI, as Governor of the State of New York, et al., Appellants-Respondents.
STATE OF CONNECTICUT et al., Respondents,
v.
STATE OF NEW YORK et al., Appellants.
Court of Appeals of the State of New York.
Argued February 15, 2000.
Decided April 4, 2000.
*578 *579 *580 *581 *582 Michael D. Hess, Corporation Counsel of New York City (Elizabeth I. Freedman, Leonard Koerner, Gail Rubin and Spencer Fisher of counsel), and Richard M. Weinberg, for appellants in the first above-entitled action.
Eliot Spitzer, Attorney General, New York City (Edward D. Johnson, Preeta D. Bansal and Marion R. Buchbinder of counsel), for respondent in the first above-entitled action.
*583 Eliot Spitzer, Attorney General, New York City (Edward D. Johnson, Preeta D. Bansal and Deon J. Nossel of counsel), for appellants-respondents in the second, third and fourth above-entitled actions and appellants in the fifth above-entitled action.
*584 Thelen Reid & Priest, L. L. P., New York City (Richard P. Swanson and Consuelo Alden Vasquez of counsel), for respondents-appellants in the second above-entitled action.
Roberts & Holland, L. L. P., New York City (Carolyn Joy Lee, Glenn Newman, Lary S. Wolf and Ann Cochran-Becchina of counsel), for respondents-appellants in the third above-entitled action.
*585 John J. Farmer, Jr., Attorney General of New Jersey, Trenton (Patrick DeAlmeida and Jeffrey J. Miller of counsel), and McCarter & English, L. L. P., New York City (Michael A. Guariglia, William D. Wallach, Joseph R. Scholz and Margaret C. Wilson of counsel), for respondents-appellants in the fourth above-entitled action.
*586 Richard Blumenthal, Attorney General of the Connecticut Bar, admitted pro hac vice, and Paul, Hastings, Janofsky & Walker, L. L. P., New York City (Charles T. Lee and Kurt W. Hansson of counsel), for respondents in the fifth above-entitled action.
Chief Judge KAYE and Judges BELLACOSA, SMITH, LEVINE, CIPARICK and ROSENBLATT concur.

*587 OPINION OF THE COURT
WESLEY, J.
For over three decades, the City of New York has imposed a tax on nonresident commuters who work in the City. In 1999, however, the Legislature attempted to rescind the tax for State resident commuters while retaining the tax for out-of-State commuters. Anticipating challenges to the new statute, the Legislature added a poison pillif a court declares the new law void, the entire tax authorization statute is repealed.
The cases before us present two distinct challenges to the 1999 statute. One, brought by the City, seeks to undo the entire 1999 enactment and preserve the tax in its pre-1999 form on the ground that the statute was enacted in violation of the home rule provisions of the State Constitution. The other, brought by residents of New Jersey and Connecticut and by the State of Connecticut, seeks to terminate the tax on the grounds that the taxing scheme as amended in 1999 violates the Federal Constitution.
For the reasons that follow, we hold that chapter 5 of the Laws of 1999 does not violate the home rule provisions of the State Constitution. However, it fails to pass Federal constitutional muster under the Privileges and Immunities and Commerce Clauses. Thus, the provision of the statute that repeals the entire commuter tax takes effect.

I.

Factual Background
Cities in New York having a population of one million or more have been authorized to impose a personal income tax on their residents (Tax Law § 1301). In 1966, the Legislature further authorized New York City to adopt and amend local laws imposing a tax on the earnings of individuals who work, but do not live, in the City ("the commuter tax") (see, General City Law § 25-m et seq.). That same year, the City imposed the commuter tax on the wages and self-employment net earnings of every nonresident individual working in the City (Administrative Code of City of NY § 11-1902).[1] The term "nonresident" applied to both in-State and out-of-State residents who did not live in the City (Administrative Code § 11-1901 [i]).
*588 Chapter 5 of the Laws of 1999 amended the definition of "nonresident individual" in Tax Law § 1305 (b) and General City Law § 25-m (1) (h) respectively to exclude State residents. Thus, chapter 5 permits the imposition of the commuter tax on out-of-State residents who work in New York City, but prohibits taxing commuting residents who come to the City from other New York counties. Chapter 5 also provided that if the changes to the definition of "nonresident individual" were held to be invalid or unconstitutional, the commuter tax would be retroactively repealed in its entirety as of July 1, 1999.
This appeal is a consolidation of five separate lawsuits challenging the enactment of chapter 5. In the first action, the City of New York seeks a declaration that chapter 5 is unconstitutional primarily on the ground that it was passed without a home rule message from the City.[2] The remaining four actions are brought by, or on behalf of, residents of New Jersey and Connecticut who work in the City, and by the State of Connecticut. These plaintiffs argue that chapter 5 violates the Federal Constitution and seek an injunction enjoining further collection of the tax. Plaintiffs in Wolf also seek attorneys' fees.
Supreme Court, in a well-reasoned decision, declared the continued taxation of nonresident commuters unconstitutional.[3] The court declined to enjoin collection of the tax and also denied the Wolf plaintiffs' application for attorneys' fees. The Appellate Division unanimously affirmed. We agree with our colleagues in the courts below.

*589 II.

Home Rule Challenge by the City
Article IX of the Constitution provides that the Legislature has power to act "in relation to the property, affairs or government of any local government only by general law, or by special law only * * * on request of two-thirds of the total membership of [the locality's] legislative body or on request of its chief executive officer concurred in by a majority of such membership" (NY Const, art IX, § 2 [b] [2]). Thus, a special law that relates to the property, affairs or government of a local municipality requires a home rule message.
The path of home rule over the years has been controversial, reflecting the "difficult problem of furthering strong local government but leaving the [S]tate just as strong to meet the problems that transcend local boundaries, interests and motivations" (Wambat Realty Corp. v State of New York, 41 NY2d 490, 498; see, Matter of Town of Islip v Cuomo, 64 NY2d 50, 54-56, quoted in Kamhi v Town of Yorktown, 74 NY2d 423, 428).[4] Chief Judge Cardozo's concurrence in Adler v Deegan (251 NY 467, rearg denied 252 NY 574, remittitur amended by 252 NY 615) set the standard for balancing State and local interests in resolving the question of whether a home rule message is required:
"There are some affairs intimately connected with the exercise by the city of its corporate functions, which are city affairs only * * * There are other affairs exclusively those of the [S]tate * * * A zone, however, exists where [S]tate and city concerns overlap and intermingle * * * The question to be faced is this: Has the [S]tate surrendered the power to enact local laws by the usual forms of legislation where subjects of [S]tate concern are directly and substantially involved, though intermingled with these, and perhaps identical with them, are concerns proper to the city? * * * The test is * * * [t]hat if *590 the subject be in a substantial degree a matter of [S]tate concern, the Legislature may act, though intermingled with it are concerns of the locality" (id., at 489-491 [concurring opn; emphasis added; citations omitted]).
Thus, where State interests are involved "to a substantial degree, in depth or extent" the State may freely legislate without home rule approval, notwithstanding the legislation's impact on local concerns (Wambat Realty Corp. v State of New York, supra, at 494; see also, Matter of Kelley v McGee, 57 NY2d 522, 538). However, the special law must bear a reasonable relationship to the legitimate, accompanying substantial State concern (City of New York v Patrolmen's Benevolent Assn., 89 NY2d 380, 391).
We conclude that chapter 5, concededly a special law applying only to New York City, did not require a home rule message. Even assuming that chapter 5 relates to the "property, affairs or government" of New York City, the law is supported by substantial State interest.
In 1966 the Legislature authorized the City to impose the commuter tax; in 1999, it altered that authorization. The power to tax, of course, rests solely with the Legislature (NY Const, art III, § 1; art XVI, § 1; Castle Oil Corp. v City of New York, 89 NY2d 334, 338, supra; Greater Poughkeepsie Lib. Dist. v Town of Poughkeepsie, 81 NY2d 574, 579; Sonmax, Inc. v City of New York, 43 NY2d 253, 257). This power is inherent in our form of government and is premised on legislative accountability to the electorate (see, Greater Poughkeepsie Lib. Dist. v Town of Poughkeepsie, supra, at 579).
The stated justification for chapter 5 was tax relief to State residents who live in communities outside New York City (Sponsor's Mem, Senate Mem in Support, Rules Committee Mem, Bill Jacket, L 1999, ch 5). The Legislature was prompted by the belief that the statute would provide tax relief to more than 454,000 State residents who work, but do not live, in New York City (see, Sponsor's Mem, op. cit.). Clearly, a tax paid only by New York State residents who live outside New York City is a matter of substantial State concern. Moreover, another stated intention was to make the City more attractive for investment and growth, a goal with obvious implications for the State (see, Senate Mem, op. cit.). Thus, the legislative history reinforces the legitimate, substantial State interest in repealing the commuter tax.
*591 The City contends that the primary purpose behind passage of chapter 5 was to influence an election in a Senate district. The City argues that this negates any actual and substantial State interest in the matter. State electoral politics, hasty procedures used to pass the statute and retention of a similar commuter tax provision in Yonkers are offered by the City to demonstrate the "true" political motivations for passage of the statute.
The vortex of the legislative process is often the intersection of politics and policy. Speculation on the "political" motivation of the Legislature as a judicial construct for statutory analysis in an appropriate area of legislative activity would be a slippery and dangerous slope. "`If the Legislature might constitutionally pass such an act, if the act be clothed with all the requisite forms of law, a court sitting as a court of law cannot inquire into the motives by which law was produced'" (People v Devlin, 33 NY 269, 280, quoting Fletcher v Peck, 6 Cranch [10 US] 87, 130-131; see also, City of New York v Village of Lawrence, 250 NY 429, 436 [if the Legislature had the power to pass an act, the courts may not inquire into the reasons which moved the Legislature to exercise its power]). We have consistently relied upon the stated purpose and legislative history of the act in question to find, or reject, a substantial State concern, and do so here (see, City of New York v Patrolmen's Benevolent Assn., supra, at 391).
The City lastly contends that because the Legislature requested a home rule message when the enabling law was initially enacted in 1966 (and on several occasions extending the tax since), a home rule message was required prior to passage of chapter 5. Although the Legislature may have asked for home rule messages in the past, that is not determinative of the issue before uswhether such messages were constitutionally required (Whalen v Wagner, 4 NY2d 575, 581). The motivations of the Legislature in that regard do not reshape or preclude our constitutional analysis. Furthermore, the City's argument would require us to conclude that by initially enacting the commuter tax law in 1966 the State surrendered to the City its power to legislate further in this area. Although the State appropriately authorized the City to implement the commuter tax, it never ceded its taxing authority to the City. Indeed, article XVI, § 1 of our Constitution provides that "the [State's] power of taxation shall never be surrendered, suspended or contracted away."
A home rule message was not required. The statute meets the Adler test: it addresses a subject of substantial State *592 concern and it bears a reasonable relationship to that concern. It accomplishes the clearly expressed legislative objective of easing the burden on those State residents working in New York City, but living outside the City limits by repealing the commuter tax. We cannot think of a more direct way to ease the burden of a tax than to repeal it.

III.

Federal Constitutional Challenges Against the State
The remaining claims are brought by out-of-State commuters who work in New York City and by the State of Connecticut. They present Federal constitutional challenges under the Privileges and Immunities and Commerce Clauses.[5]

The Privileges and Immunities Clause
The Privileges and Immunities Clause of the United States Constitution (US Const, art IV, § 2) provides:
"[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."
Like the Commerce Clause, the Privileges and Immunities Clause derives from the fourth article of the Articles of Confederation and was promulgated to create a national economic union, with one citizenry, by placing the citizens of each State on equal footing with citizens of other States, as far as the advantages resulting from citizenship in those States are concerned (see, Supreme Ct. v Piper, 470 US 274, 279-280). The goal was to insure that the union of States would provide an economic system that would work to benefit all citizens of the union (see, The Federalist No. 7, at 61 [Alexander Hamilton] [Rossiter ed 1961]).
In resolving constitutional challenges to State tax measures under this Clause, the Supreme Court has made clear that "in taxation, even more than in other fields, legislatures possess the greatest freedom in classification" (Madden v Kentucky, 309 US 83, 88). Review of taxation matters thus is narrow and *593 must balance the significant discretion of a State Legislature with Federal constitutional interests. When the controversy involves a State tax scheme that contravenes rights secured by the Federal Constitution, the decision depends not on a question of form, construction or definition of the tax, but upon its practical operation and effect (Shaffer v Carter, 252 US 37, 55).
The Privileges and Immunities Clause is not absolute (Toomer v Witsell, 334 US 385, 396), and affords no assurance of precise equality in taxation between residents and nonresidents of a particular State (Lunding v New York Tax Appeals Tribunal, 522 US 287, 297). Instead, the Clause requires a standard of "substantial equality of treatment" for the citizens of the taxing State and nonresident taxpayers (Austin v New Hampshire, 420 US 656, 665).
In addition to the "substantial equality" standard, the Court in Supreme Ct. v Piper (supra) identified a test to determine whether a State may sustain a tax that discriminates on the basis of State residence under the Privileges and Immunities Clause. The taxing State must demonstrate both that there is a substantial reason for the difference in treatment and that the discrimination practiced against nonresidents bears a substantial relationship to the taxing State's objective (id., at 284 [citations omitted]).
At the outset, the State argues that in assessing whether "substantial equality" exists between residents and nonresidents, this Court is obliged to take into account the State's tax system as a whole. The State would have us compare chapter 5 with a plethora of general revenue taxes paid by residents, such as sales, gasoline and liquor taxes, to determine whether there is "substantial equality" between in-State and out-of-State residents in the "general burden of taxation."
The Supreme Court's Privileges and Immunities Clause jurisprudence confirms that in assessing whether "substantial equality" exists between residents and nonresidents, the commuter tax may not be deemed an offset to an aggregation of general revenue taxes. The basis for comparing a "discriminatory tax" is narrower in scope (see, Travellers' Ins. Co. v Connecticut, 185 US 364, 367; Travis v Yale & Towne Mfg. Co., 252 US 60, 81). The "substantial equality" of the tax is measured by the impact of the tax in question on nonresident and residents and does not employ a determination of each group's relative tax burdens. To accept the State's position would relegate constitutional analysis to a difficult, if not impossible, *594 tax calculation that might vary between neighboring States and indeed the lifestyles of individual commuters.
Turning to the Piper test, the State argues that balancing the tax burden between in-State and out-of-State resident commuters is the "substantial reason" for enactment of chapter 5. According to the State, the tax on nonresident commuters under chapter 5 represents no more than a fraction of the other taxes paid by resident commuters for the benefit of New York City. The State contends, for example, that, unlike nonresidents, resident commuters pay taxes on general sales items, unearned income, liquor and gasoline, all of which support the public conveniences provided by New York City. The State argues that these taxes are either not imposed on nonresident commuters or are imposed to a lesser extent and therefore represent a significant tax burden on resident commuters when compared to their nonresident counterparts. Under this rationale, because New York State residents pay more to support City services than out-of-State residents, the discriminatory tax is justified. The State also argues that the lower courts ignored the economic benefits that nonresident out-of-State commuters receive from New York City in terms of fire, police, transportation and emergency health services.
We conclude that the reasons proffered by the State fail to satisfy the test of "substantiality." The legislative history of chapter 5 reveals no "tax equalization" rationale for in-State and out-of-State commuters at the statute's passage. To the contrary, the State was concerned with providing a tax break to New York State resident commuters who work in the City, as well as attracting business to New York City. Relieving the differential burden between State residents and nonresidents was not part of the legislative focus.
Even if relieving the differential tax burden had been a reason for passage of chapter 5, the courts below correctly determined that the State failed to establish an issue of fact that any such differential tax burden exists. Many of the "offsetting" taxes are paid by all New York residents whether or not they work in New York City, and are also paid by Connecticut and New Jersey commuters who purchase goods and services while in New York.
Moreover, the affidavit relied upon by the State contradicts its position. The affidavit notes that when New York City is viewed in isolation from its suburbs, City residents pay more to the State in revenue than they receive from the State in *595 expenditures. Thus, according to the affidavit, New York City is not a net drain on the financial strength of the rest of the State and, contrary to the State's argument, resident commuters are not supporting New York City through the numerous taxes. Nor is it of any consequence that nonresident commuters may, at times, benefit from City services. The tax on nonresident commuters is not a "fee" for those services; the tax is not predicated on a "cost" for the City services commuters use, nor is it correlated to State subsidies of those services.
The "substantiality" test also is not met with regard to the means chosen to tax nonresidents vis-à-vis the State's objectives. Here, the State has made no showing that nonresidents are a "peculiar source of the evil" at which chapter 5 is aimed (Toomer v Witsell, supra, at 398). Although there is no evidence that nonresident commuters pay less in taxes than their New York State counterparts, there is also no reasonable relationship between the "danger" of a disparate tax burden between New Yorkers and nonresident commuters as a class to justify the discrimination practiced against them (see, id., at 399). Commuting into the City is not a taxable event substantially equivalent to the events on which these other taxes are based. The language of the statute plainly and frankly discriminates against nonresidents. There is little doubt but that the discrimination is so great that both its purpose and effect are exclusionary.
This case is analogous to both Travis v Yale & Towne Mfg. Co. (supra) and Austin v New Hampshire (supra). In Travis, the Supreme Court struck down a New York law that permitted New York State residents an exemption on the first $1,000 of income (or $2,000 if filing jointly), but denied nonresidents the same exemption in calculating New York income subject to State income tax. The Court stated:
"This is not a case of occasional or accidental inequality due to circumstances personal to the taxpayer * * * but a general rule, operating to the disadvantage of all nonresidents including those who are citizens of the neighboring [S]tates, and favoring all residents including those who are citizens of the taxing [S]tate" (Travis v Yale & Towne Mfg. Co., supra, at 80-81 [citations omitted]).
Here, too, chapter 5 operates as a general rule and intentionally creates inequality between resident and nonresident commuters. The Privileges and Immunities Clause plainly and *596 unmistakably secures and protects the right of the citizens of one State to be exempt from any higher taxes or excises than those imposed by another State upon its own citizens (see, Ward v Maryland, 12 Wall [79 US] 418, 430).
In Austin, the Court determined that a New Hampshire statute violated the Privileges and Immunities Clause because it imposed an income tax on nonresident commuters who worked within the State, while imposing no income tax on New Hampshire residents. Pointing out that "nonresidents are not represented in the taxing State's legislative halls" (Austin v New Hampshire, supra, at 662), the Supreme Court concluded that the tax fell exclusively on the income of nonresidents and there was no substantial equality of taxation between the residents and nonresidents. Here, as in Travis and Austin, the tax at issue denies nonresidents one of the Privileges and Immunities of New York residents. Accordingly, the tax violates article IV, § 2 of the United States Constitution.

The Commerce Clause
The Commerce Clause provides that "[t]he Congress shall have Power * * * [t]o regulate Commerce * * * among the several States" (art I, § 8, cl [3]). Though phrased as a grant of regulatory power to Congress, the Commerce Clause has long been understood to have a "negative" or "dormant" power that prevents individual States from interfering with, or discriminating against, interstate trade (see, Oregon Waste Sys. v Department of Envtl. Quality, 511 US 93, 98; Fulton Corp. v Faulkner, 516 US 325, 330; see also, Matter of Tamagni v Tax Appeals Tribunal, 91 NY2d 530, 539, cert denied 525 US 931). In keeping with the original intent of the Commerce Clause to prevent the economic Balkanization that characterized the Confederation, the dormant Commerce Clause prohibits economic protectionism through regulatory measures designed to benefit in-State economic interests by burdening out-of-State competitors (see, New Energy Co. v Limbach, 486 US 269, 273-274; see also, Matter of Tamagni v Tax Appeals Tribunal, supra, at 539).
The first step in dormant Commerce Clause analysis is to determine whether the statute in question "`regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce'" (Oregon Waste Sys. v Department of Envtl. Quality, supra, at 99 [citations omitted]). Discrimination means differential treatment on in-State and out-of-State economic interests that benefits the *597 former and burdens the latter (id.). State laws discriminating against interstate commerce on their face are "virtually per se invalid" (id. [citations omitted]).
The State contends that the statute does not "discriminate" within the meaning of the Commerce Clause jurisprudence. On its face, however, chapter 5 does just that: it imposes a tax on out-of-State commuters, but not on in-State commuters. A taxing scheme that taxes only nonresidents who work in New York City obviously favors resident commuters. It treats in-State and out-of-State economic interests differently and taxes nonresidents simply because they cross State lines. Thus, the tax scheme benefits residents of New York State and burdens residents of other States who commute to New York City on a daily basis. The law promotes economic protectionism and is incompatible with a single national economic unit. It therefore is facially invalid.
Because chapter 5 is facially discriminatory, the tax may survive Commerce Clause scrutiny only if the State can show that the tax advances a local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives (Oregon Waste Sys. v Department of Envtl. Quality, supra, at 100-101 [citations omitted]). The State, again, contends that the purposes for the tax are equalization of the tax burden and tax relief for residents of New York. Nonetheless, tax relief for residents does not justify a discriminatory tax on nonresident workers (see, Baldwin v G. A. F. Seelig, 294 US 511, 527 [Cardozo, J.] ["Neither the power to tax nor the police power may be used by the state of destination with the aim and effect of establishing an economic barrier against competition with the products of another state or the labor of its residents"]).
The State argues that Commerce Clause analysis is not implicated here because plaintiffs failed to show that chapter 5 has a demonstrable effect on any identifiable interstate market. It has long been recognized, however, that the movement of persons across State lines is a form of commerce (see, Camps Newfound/Owatonna v Town of Harrison, 520 US 564, 573, citing Edwards v California, 314 US 160, 172). In Camps, the Court found that nonresident campers who crossed State lines to attend a camp in Maine affect interstate commerce. Here, thousands of New Jersey and Connecticut residents commute into New York City on a daily basis, earning and spending part of their income in New York City, while paying the commuter tax. This clearly impacts interstate commerce.
*598 Moreover, we reject the State's argument that Matter of Tamagni v Tax Appeals Tribunal (supra) stands for the proposition that the Commerce Clause does not protect commuters. The taxpayers in Tamagni were statutory residents of New York State by virtue of maintaining a permanent place of residence in New York City in addition to a home in New Jersey. We noted that although the taxpayers were domiciliaries of New Jersey, they were subject to the New York State resident income tax in the same manner as were full-time New York State residents. In that case, the dormant Commerce Clause was inapplicable because the questioned New York income tax provisions were based solely on the Tamagnis' status as New York residents, "without regard to any specific commercial or economic transaction or activity" (id., at 538). Moreover, the intangible income at issue in Tamagni was not earned in any particular State and could not be traced to any jurisdiction outside New York. Here, the tax clearly is assessed against the interstate labor market per se (see, id., at 541) and favors intrastate economic activity over interstate activity by taxing only out-of-State workers.
In sum, chapter 5 of the Laws of 1999 violates the Commerce Clause of the Federal Constitution.

IV.
Finally, we address the Wolf plaintiffs' request for attorneys' fees pursuant to Tax Law § 3030 and the denial of injunctive relief from the State's continued collection of the tax.
Tax Law § 3030 was enacted to provide taxpayers with additional rights and equitable relief under the Taxpayer Bill of Rights Act of 1997 (Governor's Program Bill Mem, Bill Jacket, L 1997, ch 577). Section 3030 permits a discretionary award of attorneys' fees to the prevailing party in a proceeding in which the Commissioner is a party and which involves the determination, collection or refund of any tax (Tax Law § 3030 [a]). A prevailing party is not entitled to recover attorneys' fees if the Commissioner satisfies his burden of proving, by a preponderance of the evidence, that his position was substantially justified (Tax Law § 3030 [c] [5] [B]).
Here, the State has demonstrated that the Commissioner's position is substantially justified. This litigation represents the State's obligation to defend the constitutionality of a tax law that was passed by the State Legislature and signed by the Governor. An award of attorneys' fees is not appropriate in this circumstance.
*599 Lastly, plaintiffs argue that the courts below erred in not issuing a permanent injunction enjoining New York from enforcing the tax. However, the availability of a tax refund here renders injunctive relief inappropriate; the refund process provides an adequate remedy at law.
The parties' remaining arguments are without merit.
Accordingly, the order of the Appellate Division should be modified, without costs, by declaring that chapter 5 of the Laws of 1999 does not violate the home rule provisions of the State Constitution, and as so modified, affirmed.
Order modified, etc.
NOTES
[1] The tax is a flat rate of .45 of 1% on wages and .65 of 1% on net earnings from self-employment. Although administered by New York State, the tax is deposited into the City's general fund. Prior to passage of chapter 5, the City collected $360 million annually from the commuter tax. Of that amount, New York State residents paid approximately $210 million.
[2] The City raises two additional challenges in an attempt to preserve the tax. First, the City contends that, since the statute does not repeal the Administrative Code provisions that implement the tax, those provisions still have life. However, the statute repeals the authority on which the Code provisions are based; those provisions therefore are no longer effective (see, Castle Oil Corp. v City of New York, 89 NY2d 334). Second, the City argues that the statute unlawfully delegates the Legislature's power by allowing a court to effectuate a repeal of the tax. Legislative anticipation of judicial interpretation of a statute is nothing new. Although the anticipation is ordinarily reflected in severability clauses that call for a legislative act to continue if one section is stricken, the direction that the entire statute falls if sections 1 and 2 are invalidated was an appropriate legislative choice, and cannot be construed as delegating legislative power to the judiciary.
[3] Supreme Court also dismissed the City's action. It was error, however, to dismiss the complaint in this action for a declaratory judgment merely because plaintiffs were not entitled to the declaration they sought (see, Lanza v Wagner, 11 NY2d 317, 334).
[4] See, Cole, Constitutional Home Rule in New York: The Ghost of Home Rule, 59 St John's L Rev 713 (1985); Note, Home Rule and the New York Constitution, 66 Colum L Rev 1145 (1966); Hyman, Home Rule in New York 1941-1965: Retrospect and Prospect, 15 Buffalo L Rev 335 (1965); Comment, Home Rule: A Fresh Start, 14 Buffalo L Rev 484 (1965); Asch, Municipal Home Rule in New York, 20 Brooklyn L Rev 201 (1954); Richland, Constitutional City Home Rule in New York, 54 Colum L Rev 311 (1954).
[5] Although these plaintiffs also ask us to find the law unconstitutional on independent State grounds under the Equal Protection Clause of the State Constitution, they fail to demonstrate how in this case that provision provides greater protection than its Federal counterpart. Indeed, they offer only Federal decisions to support their argument (see, Golden v Clark, 76 NY2d 618, 623, n 2). Thus, we reject this argument.