Norman, Auditor, v. The Kentucky Board of Managers, &c.

CASE 96—MANDAMUS—DECEMBER 9.

# Norman, Auditor, v. The Kentucky Board of Managers of World's Columbian Exposition.

### APPEAL FROM FRANKLIN CIRCUIT COURT.

| 93 | 537 |
| 94 | 326 |
| 93 | 537 |
| 99 | 83 |

| 93 | 537 |
| 105 | 849 |
| 93 | 537 |
| 120 | 133 |

| 93 | 537 |
| 119 | 244 |
| 119 | 245 |

| 93 | 537 |
| 129 | 288 |

1. THE STATE AUDITOR has the right, when called upon to issue his warrant upon the Treasury for money appropriated by act of the Legislature, to question the validity of the act making the appropriation.

2. AN APPROPRIATION by the Legislature of money to be expended by commissioners, for the purpose 'of making an exhibit of the resources of the State at the World's Fair, was not in violation of the State Constitution.

3. FINAL PASSAGE OF BILL.—Where a bill is passed by one House of the General Assembly, and after being amended by the other House is returned to the House by which it was originally passed, its passage by that House as amended is its "final passage," within the meaning of section 46 of the State Constitution, and it must, in order to become a law, then receive the vote prescribed by that section, and that vote must be taken by yeas and nays and entered in the journal.

4. THE WRIT OF MANDAMUS should be granted or withheld, in the discretion of the court, as the purposes of justice may require, and therefore should not be granted to afford relief which the party applying for the writ claims by virtue of an act of the Legislature which facts admitted by him to be true show was not constitutionally passed, even though it might not be competent to prove those facts if they were denied.

In a proceeding by commissioners representing the State against the State Auditor, to compel him by mandamus to issue his warrant for money claimed to have been appropriated by act of the Legislature, as the answer of the Auditor set out the facts connected with the passage of the act as shown by the Journals of the two Houses, a general demurrer to the answer admitted these facts to be true, and as they showed that the bill was not passed as required by the Constitution, it was error to sustain the demurrer. Whether, if those facts had been denied, the House and Senate Journals would have been competent evidence to impeach the enrolled bill, properly signed by the Speakers of the two Houses and by the Governor, is not determined.

Norman, Auditor, v. The Kentucky Board of Managers, &c.

5. A DEMURRER ADMITS AS TRUE only averments of facts well pleaded,
and not legal conclusions.

KNOTT & EDELEN AND WM. GOEBEL FOR APPELLANT.
    Brief not in record.

HUMPHREY & DAVIE FOR APPELLEES.

1. An appropriation of money to make an exhibit of the resources of
the State at the World's Fair, along with similar exhibits from
other States and nations of the world, was a valid exercise of
legislative power. (Daggett v. Colgan, 92 Cal., 53; 27 Am. St.
Rep., 95; Kingman v. Brockton, 153 Mass., 255; Gilford v. Sup-
ervisors, 13 N. Y., 149; Loan Association v. Topeka, 20 Wall.,
665; Weisner v. Village, 64 N. Y., 91; Cooley on Taxation, 2d
ed., 103; Zigler v. Menges, 16 Am. St. Rep., 369; Barbour v.
Board of Trade, 82 Ky., 604.)

2. As this act is within the sphere of legislative power, and upon its
face appears to be valid; and as it is signed by the Speakers of
the Houses and the Governor as having been duly passed, the
Auditor should not be allowed to treat it as void, and to raise the
inquiry as to whether, in point of fact, the Legislature, in the
process of passing it, were guilty of irregularities or disregarded
constitutional rules of procedure. (People v. Saloman, 54 Ill., 46;
Mechem on Public Officers, sec. 523; Sessums v. Botts, 34 Tex.,
335; Ortman v. Greenman, 4 Mich., 291; Wellington v. Peti-
tioners, 16 Pick., 95; Antony v. Wright, 22 Grat., 857; Jones v.
Black, 48 Ala., 540; Smith v. McCarthy, 56 Pa. St., 359; Lopez
v. The State, 42 Tex., 298; Cooley on Constitutional Limitations,
p. 196.)

3. Neither the Auditor nor his sureties could be held liable for draw-
ing the warrant to the commissioners, as he would draw it in
the exercise of his duty, and in obedience to a statute apparently
valid and duly authenticated in the enrolled archives of the
State. (Kendall v. Stokes, 3 How., 87; Stutman v. Wallace, 142
U. S., 309; Sessums v. Botts, 34 Tex., 335; Despan v. Olney, 1
Curtis, 307; People v. Bradley, 64 Barbour, 237; Jenkins v.
Waldron, 6 Am. Dec., 359; Stuart v. Southard, 49 Am. Dec.,
463; Donahue v. Richards, 61 Am. Dec. 256.)

4. Even though a subordinate ministerial officer were to be allowed to
obstruct the government by refusing to obey acts, on his idea
that they are unconstitutional, where the unconstitutionality can
be seen from the face of the act itself; he will not be allowed to
raise such point where the act is apparently constitutional and
duly authenticated, but his objection is that, in the process of its
passage through the Legislature, it disregarded some constitu-
tional requirement as to legislative procedure. (Auditor v. Hay-
craft, 14 Bush, 287.)

Norman, Auditor, v. The Kentucky Board of Managers, &c.

5. The question whether a certain act has been passed by the Legislature is a question for the court to decide, from its judicial knowledge. And the weight of reasoning and authority is, that the enrolled bill, certified and signed by the Speakers of the two Houses, in the presence of their respective Houses, as having been duly passed by the Legislature, and approved by the Governor as having been duly passed by the Legislature, and enrolled in the archives of the State as a bill that has been duly passed, and published by the State for the public guidance in its published acts as having been duly passed, will be taken by the courts as the basis of their judicial knowledge. (Rex v. Arundel, Hobart's Rep., 110; for English rule, see note to 85 Am. Dec., 357; Field v. Clark, 143 U. S., 649; Lyons v. Woods, 153 U. S.; In re Thompson, 9 Atty. Gen. Opinions, 1, copied in 8 Ind., 166; Graves v. Alsop, 1 Arz., 274; s. c., 25 Pacific Rep., 836; Sherman v. Story, 30 Cal., 253; 89 Am. Dec., 93; Eld v. Gorham, 20 Conn., 8; Territory v. O'Connor, 5 Dak., 397; Evans v. Brown, 30 Ind., 514; 95 Am. Dec., 710; Duncomb v. Prindle, 12 Ia., 1; Auditor v. Haycraft, 14 Bush, 287; Com. v. Jackson, 5 Bush, 680; Whited v. Lewis, 25 La. Ann., 568; State v. Richoux, 23 La. Ann., 743; 8 Am. Rep., 161; Weeks v. Smith, 81 Me., 538; Mayor v. Harwood, 32 Md., 471; s. c., 3 Am. Rep., 161; Mayor v. Harwood, 32 Md., 471; Ex parte Wren, 63 Miss., 512; s. c., 56 Am. Rep., 825; Comstock v. Tracey, 46 Fed. Rep., 163 (from Minn.); Pacific R. Co. v. Governor, 23 Mo., 353; s.c., 66 Am. Dec., 673; State v. Swift, 10 Nev., 176; s. c., 21 Am. Rep., 721; Pangborn v. Young, 32 N. J., L., 29; People v. Marlborough, 54 N. Y., 276; State v. Robinson, 81 N. C., 409; Com. v. Martin, 107 Pa. St., 185; Perkins v. City Philadelphia, 27 Atlantic Rep., 356; State v. Town Council, 38 S. C.; s.c., 17 Southwestern Rep., 752; Williams v. Taylor, 83 Tex., 667; Territory v. Clayton, 5 Utah, 598; Matter of Wellman, 20 Vt., 656; State v. Jones, 8 Wash.; s. c., 34 Pacific Rep., 201.)

6. The courts which hold that they may reject the authentications of the Speakers of the two Houses and the Governor, and the enrolled bill, and look into the journals of the clerk to impeach an act, are less in number and unsatisfactory in reasoning. In many the later decisions the same courts express regrets that the courts had not, in the beginning, adopted the other view, and they are trimming down the former decisions by "presuming," wherever they can, that everything has been rightly done by the Legislature. (Hall v. Steele, 82 Ala., 562; Glidwell v. Martin, 51 Ark., 559; People v. Dunn, 80 Cal., 211; Hughes v. Felton, 11 Col., 489; State v. Deal, 24 Fla., 293; s. c., 12 Am. State Rep., 204; People v. Sterne, 35 Ill., 121; s.c., 85 Am. Dec., 356; Chicago R. Co. v. Manhattan, 45 Kan., 419; Straus v. Heiss, 48 Md., 292; People v. Burch, 84 Mich., 408; Lincoln v. Hangan, 45 Minn., 451; State

v. Mead, 71 Mo., 266 ; State v. Van Duyn, 24 Neb., 586 ; Opinion Justices, 52 N. H., 622 ; State v. Kiswalter, 45 Ohio St., 254 ; State v. Rovers, 22 Ore., 348 ; State v. Algood, 87 Tenn., 163 ; Wise v. Riggar, 79 Va., 269 ; Osborne v. Stately, 5 W. Va., 85 ; McDonald v. State, 80 Wis., 407 ; Meracle v. Down, 64 Wis., 323 · Union Pac. R. Co. Case, 1 Wyo., 96.)

7. Those courts which hold they will look back into the journals also hold, in their more recent decisions, that unless the journal affirmatively shows that the constitutional steps were not taken the act will be valid, and that a mere silence of the journal on the subject is not sufficient to impeach the act. (Hall v. Steele, 82 Ala., 562 ; Chicago R. Co. v. Manhattan, 45 Kan. 419.)

8. Upon the question as to what is meant by the "final passage" of a bill, the following authorities hold that all the constitutional steps must be taken with respect to an amendment as much as to the original bill. (The Bond Debt Case, 12 S. C. Rep., 290 ; · Railroad Tax Cases, 8 Sawyer's U. S. Circuit Court Rep., 293 ; s. c., 13 Federal Rep., 767 ; People v. DeWolfe, 62 Ill., 253. The following cases are cited to the contrary : State v. Liebke, 9 Neb., 493 ; McCulloch v. State, 11 Ind., 434 (see 30 Ind., 514) ; Hall v. Miller, 4 Neb., 505 ; State v. Platt, 2 S. C., 150 ; Miller v. State, 3 Ohio St., 482 ; People v. Wallace, 70 Ill., 680.)

9. The demurrer to the answer only admits what is properly pleaded, and does not admit to be true the allegations that the Legislature did not pass this act. Laws do not stand on the uncertainty of the varied pleadings in this or that case, but upon the more certain basis of a general judicial knowledge which the court takes as to whether or not an act is a law, which is the same in all cases, irrespective of the individual pleadings. (Civil Code, sec. 119 ; Gardner v. Collector, 6 Wall., 511 ; Cooley's Const. Lim., 6th ed., p. 163, note ; State v. Smith, 44 Ohio St., 348 ; Legg v. Mayor, 42 Md., 203 ; Happell v. Brethauer, 70 Ill., 166 ; Jennings v. Russell, 92 Ala., 603 ; Jordan v. Shoe Co., 74 N. Y., 472 ; Graves· v. Alsop, 1 Arz., 274 ; Sherman v. Story, 30 Cal., 253 ; s. c., 89 Am. Dec., 101 ; Rankin v. Colgan, 92 Cal., 605 ; Atty. Gen. v. Rice, 64 Mich., 385 ; Field v. Clark, 143 U. S., 678.)

W. P. D. BUSH OF COUNSEL ON SAME SIDE.

CHIEF JUSTICE HOLT DELIVERED THE OPINION OF THE COURT.

The questions in this case are of supreme importance. The President of the State Board of Managers of the World's Columbian Exposition presented a proper order to the appellant, the State Auditor, for a warrant upon

the State Treasurer for a portion of the one hundred thousand dollars claimed to have been appropriated by an act of the Legislature to make an exhibit of the resources of our State at the exposition.

The Auditor, acting no doubt from a conscientious desire to properly discharge his duty, and under the advice of the Attorney-General, who is by law his legal adviser in such matters, refused it, and this is an action for a mandamus to compel him to give it.

It is said, *in limine*, that he has no personal interest in the matter; and being a ministerial officer can not refuse to issue it upon the ground that the Legislature could not constitutionally make the appropriation, or that the act was not constitutionally passed. In short, that his only duty was obedience, and that he has no standing in court.

It is a general rule that a court will not listen to one who says a legislative act is unconstitutional, unless his rights are involved, or he has a right to question it. Section 230 of our new Constitution, however, says: "No money shall be drawn from the State Treasury except in pursuance of appropriations made by law;" and our statute forbids the issue by the Auditor of a warrant upon the Treasury "unless the money to pay the same has been appropriated by law." (Gen. Stat., chap. 6, art. 1, sec. 6.) If the act of the Legislature be void for want of power to pass it, or because it was not passed in the manner required by the Constitution, then it is not law; and the Auditor is vested with such power and occupies such a position that it is not only his right, but his duty, whenever he is called upon to order the payment of money out of the Treasury, to inquire whether it is being done

legally. He is, in a certain sense, a trustee, and the public interest requires that his office should give him the right to question the validity of a legislative act under which, by means of his warrant, the public money is to be expended.

The right to the mandamus is denied by him, first, upon the ground that the Legislature had no power to make the appropriation. It is urged that it is not for a public or governmental purpose. Our Constitution says: "Taxes shall be levied and collected for public purposes only." (Section 171.) It is often difficult to draw the line which bounds constitutional taxation, or to determine whether the purpose is one in aid of which the taxing power may be invoked, or the money thus raised expended. If it be doubtful, and the Legislature has seen proper to exercise the power, the judiciary should not interfere. The doubt is then to be solved in favor of the legislative action. The object in this instance, however, is to exhibit the resources and progress of the State. It is not to promote the interest of one or a few individuals, and perhaps, incidentally, that of the public; but the purpose is public in character and calculated and intended to benefit the entire State. Our Legislature has repeatedly heretofore, and running through many years, appropriated money for like purposes, and its power to do so is now for the first time questioned. It was done in 1876 for the Centennial Exposition at Philadelphia, and later for the one at New Orleans. This was well known to the framers of our present Constitution, adopted in 1891, and had it been intended to forbid the exercise of the power by the Legislature for such purposes, it would no doubt have been done in unmistakable terms. In our opinion it con-

tains no such provision.  It is not a loaning of the credit
of the State, and, therefore, forbidden by it.  The commis-
sioners selected to expend the money are merely the
State's agents to do so and provide the exhibit for the ben-
efit of its people.  The Legislature had the power to
provide the means for such a purpose, but in doing so
was bound to act in conformity to the Constitution.  The
troublesome question in the case is whether it has done
so, and what is the duty and power of this court as the
parties present themselves.  The Auditor claims that it
has not, and this is the second ground of his defense.

Section 46 of our Constitution provides:  "No bill
shall become a law unless, on its final passage, it receives
the votes of at least two-fifths of the members elected to
each House, and a majority of the members voting, the
vote to be taken by yeas and nays and entered in the
journal: *Provided,* Any act or resolution for the appro-
priation of money, or the creation of debt, shall, on its
final passage, receive the votes of a majority of all the
members elected to each House."  The act originated in
the Senate, and passed that body upon a yea and nay vote,
entered upon its journal, by the required majority.  It
then went to the other House, where, after being amended,
it passed upon a like vote, entered upon its journal, by a
like majority.  It then came back to the Senate, where
the amendments were concurred in without a yea and
nay vote, and without the vote of a majority of the
members elected.

It is conceded by the counsel for the appellees, and
seems plain, that this mode of proceeding did not conform
to the Constitution.  It complied with it in neither letter
nor spirit.  The object of the section above cited was to

have the assent of a majority of all the members elected to each House to *all* the provisions of the act, and that this should appear by a yea and nay vote entered upon its journal. If a bill, after passing one House in the proper manner and then, after amendment, passing the other House in like manner, could come back to the House in which it originated and be adopted by a majority of those voting, or a quorum, it would defeat this object and render the section ineffectual. Let us look at it practically. An appropriation bill of one hundred dollars originates in the Senate and is properly passed. It goes to the House, where it is amended by making the sum ten thousand dollars, and is then properly passed by it. It returns to the Senate for concurrence, and is adopted as amended by a majority of those present without a yea and nay vote. Can it be well contended that this would be a compliance with the Constitution? If so, then there being thirty-eight Senators, it would require twenty, or a majority of them, to pass a bill for a trifle, but after being amended in the House, so as to perhaps bankrupt the Treasury, it could be concurred in by the Senate by the votes of eleven members, or a majority of a quorum; and in case of the House with its one hundred members, it would require fifty-one to pass the bill, if it originated there, but only twenty-six, or a majority of a quorum, to concur in it after it had been changed in like manner by the Senate. Further illustration seems needless.

It is true it has been held that the "final passage" of a bill means when it first passes the body, and not when it returns to it, after amendment, for adoption; and it is said that the constitutional provision as to the number of votes, and the entry of the yea and nay vote on the journal,

does not apply to amendments or the reports of conference committees.    If so, then no matter how material the change, a majority vote of a quorum may pass the bill. The words "final passage," as used in our Constitution, mean final passage.    They do not mean some passage before the final one, but the last one.    They do not mean the passage of a part of a bill, or what is first introduced, and which may by reason of amendment become the least important.    If so, then the body may pass what is practically a new bill in a manner counter to both the letter and spirit of the Constitution.    When the bill was voted on in the Senate as amended, and after its return from the House, there never was any further action by the Senate.    It was the final vote, and, therefore, its final passage; and being so, a majority vote of all the members elected, with an entry by yea and nay vote upon the journal, was necessary to its constitutional enactment. The bill, as approved by the Speakers of the two Houses and by the Governor, never was passed by the Senate by a majority of all its members, nor by a yea and nay vote. It is said, however, upon the one side, that having been enrolled, signed by the presiding officer of each House and approved by the Governor, the act must be conclusively presumed to have been constitutionally enacted; that public policy requires this rule, else confusion will result by our statute law being reduced from a state of certainty to one of doubt.    Upon the other side it is urged, with equal ability, that a *prima facie* case only is thereby presented, and that resort may be had to the journals of the Legislature, which are required by the Constitution to be kept, and are kept, under the supervision of all the members, as to the truth of the matter.

Each position is supported by numerous authorities, and whether the one rule or the other obtains, more or less abuse and danger may result. There is some dynamite either way, but perhaps not as much in the latter as some apprehend, as the party questioning the enrolled and approved act must at the outset overcome a *prima facie* case.

The first view is the English one, where there is no written Constitution. It has been followed by our Supreme Court, and by at least nine of the Supreme Courts of the States. The weight of authority in this country, as declared in perhaps as many as nineteen States, is, however, the other way. All agree that the enrolled and approved bill can not be impeached by loose papers or parol evidence. Public policy forbids it. Too much mischief would result. A review or citation of the numerous cases is unnecessary. They have been examined. The most, if not all of them, will be found cited in the notes on page 135 of Cooley's Con. Limitations, and to the case of Field v. Clark, 143 U. S., 661. It is not necessary, however, to a proper determination of this case to decide this question. It would, at most, be settling a mere rule of evidence, not prescribed by constitution or statute, and subject to exception and modification by the courts. If it had heretofore been prescribed, it would not control this case. Here no property rights have become fixed, no interests vested; but two parties, each the agent of the State, are contending for the control of a fund, and we must consider this case as it is presented. The court is asked to exercise its power and compel the Auditor to comply with an act of the Legislature which the Constitution required should be passed in a certain way. If the

answer of the Auditor merely averred that it was not a
law, or denied its existence, or that it had not been con-
stitutionally passed, this would be merely pleading a legal
conclusion.   It would need no denial.   The failure to do
so would not be an admission of its truth.   A court takes
judicial notice of and determines for itself the law.   You
can not aver or prove a public statute.   Thus, although a
pleading may purport to state its terms or effect, but do
so incorrectly, a demurrer does not admit the averment.
(Pennie v. Reis, 132 U. S., 464; Interstate Land Co. v.
Maxwell Land Grant Co., 139 U. S., 569.)  The court
tries the question as one of law, and a demurrer admits
as true only averments of facts well pleaded, and not
legal conclusions.

The answer of the Auditor, however, sets out the steps
connected with the passage of the act.   It states what
was done and what was not done.   It avers the facts con-
nected with its passage and files as a part of it a copy
made by the Public Printer of the journal of the Senate
relating to it.   These facts, as to the manner of its
passage, were admitted by a general demurrer.   They
show the act when it came back to the Senate, after
amendment, was not voted for by a majority of all the Sen-
ators, and that a yea and nay vote was not taken. It·was
not, therefore, constitutionally. passed; and yet the court
is asked by the appellees to use its power to enforce it by
mandamus when, by their demurrer to the answer and
failure to plead, they are to be regarded as agreeing that
this is true.

A court, when asked to exercise its power by means of
mandamus, should regard the substance and not the
shadow.   Its use is confined to those cases where the law

has given no specific remedy, and where in justice and good government there ought to be one. It is summary in character, and may be resorted to when injustice is about to be done. A court should, in its discretion, grant it only when it is essential to this end. The petitioner must have a clear right and no other appropriate remedy to prevent injustice and wrong. It is defined in our Civil Code as an order " to perform an act, or omit to do an act, the performance or omission of which is *enjoined by law,*" and is the instrument of a court of law as much as an injunction is that of a court of equity. Cases may be found where it has been refused in the exercise of a proper discretion, although the petitioner had a clear legal right; and it is to be granted or withheld in the discretion of the court as the purposes of justice may require. This being the end and object of the writ, it should not be granted to afford relief which the party claims by virtue of an act confessed by him to be unconstitutional. The attitude of the appellees and the nature of the relief asked must be considered. Although the appellees, like the Auditor, represent the State, yet they demur to the answer, saying, you can not go behind the enrolled bill, nor consider the admitted facts set out in the answer; the intended effect of this being to prevent a decision as to the validity of the act. Their action can not be disregarded when asking this writ.

The provision of the Constitution is mandatory; and when this court is called upon to exercise a power, respect for a co-ordinate department of the Government can not be suffered to override the fundamental law by virtue of which both act and exist. A constitutional rule is not only for the Legislature, but this and all other courts.

We must exercise our power with fidelity to it; and when we are urged to hold that the signatures to the act import what is confessed by the party asking relief to be untrue, and to enforce as law an act plainly in violation of the Constitution, the court, in the exercise of its discretion in the use of this writ, should withhold it.

Our personal wishes in the matter can not be consulted. If the people desire this appropriation made, the Legislature will doubtless do so; but nothing connected with the matter is more important to all than that it shall be done according to law. It is manifest the answer can not be truthfully denied; this was in substance admitted, upon the argument of the cause, by the appellees' counsel.

Under this state of case it is proper to reverse the judgment, with directions to dismiss the petition, and it is so ordered.

---

JUDGE BENNETT CONCURRED IN THE JUDGMENT, AND DELIVERED THE FOLLOWING OPINION :

The appellees, as World's Fair Commissioners, filed their petition in the Franklin Circuit Court against the appellant, as Auditor, to compel him to issue his warrant upon the Treasury for the sum of twenty-five thousand dollars upon their vouchers, approved by the Governor, for that sum, alleging that the Auditor was directed to issue the warrant by the act of the Legislature making the appropriation. The Auditor in his answer alleged that the bill making the appropriation of one hundred thousand dollars to the World's Fair originated in the Senate and passed that body upon the call of the yeas and nays, which were entered in the journal, by a constitutional majority; that the House refused to pass the bill

as it came from the Senate, but passed it with amendments, and then the bill and House amendments were sent to the Senate, and that . body concurred in the House amendments, but not by a constitutional majority, nor by the yeas and nays entered in the journal; that the bill was, therefore, unconstitutional and void. The appellants, by their demurrer to the answer, admitted the allegations of fact to be true, and insisted that, notwithstanding the truth of the allegations, the bill being *prima facie* regular and valid, the Auditor, whose duty was, in this particular, mandatory, was a ministerial officer and could not refuse obedience to the law's mandate, because there was some latent infirmity in the bill that rendered it invalid. The chancellor, upon the hearing upon the agreed facts, adjudged that the Auditor, acting in a ministerial capacity, should issue his warrant, because he had no right, as a ministerial officer, to question the constitutionality of the bill, it being *prima facie* valid. The Auditor appeals.

The Auditor relies upon section 46 of the Constitution, which reads as follows: "No bill shall be considered for final passage unless the same has been reported by a committee and printed for the use of the members. Every bill shall be read at length on three different days in each House; but the second and third reading may be dispensed with by a majority of all the members elected to the House in which the bill is pending. * * * No bill shall become a law unless, on its final passage, it receives the votes of at least two-fifths of the members elected to each House, and a majority of the members voting, the vote to be taken by the yeas and nays and entered in the journal: *Provided,* Any act or resolution for the

appropriation of money or the creation of debt shall, on its final passage, receive a majority of all the members elected to each House."

There is a history of abuses and wrongs in the legislative department under the old Constitution that caused the section *supra* to be engrafted in the Constitution and adopted by the people, to-wit: It had become a frequent practice under the old Constitution to pass bills as reported by the committee by their titles, and by a *viva voce* vote, the bills never having been read for the information of the members, only the few and faithful understanding that they contained large appropriations, grants, monopolies and other iniquities. It was intended by said section to prevent the repetition of these methods and to secure honest and enlightened legislation. Therefore it was provided that the bill should be printed for the use of the members; that it should be read at length on three different days in each House, unless the second and third readings were dispensed with by a majority of all the members elected to the House in which the bill is pending; but the reading of the bill at least once can not be dispensed with; then if the members feel fully advised they may dispense with the other two. Also, no general bill can become a law unless it receives, on its final passage, the votes of at least two-fifths of all the members elected to each House, and that number must be a majority of those voting, and the vote must be taken by yeas and nays and entered in the journal; also, a bill for the appropriation of money or the creation of a debt must receive, on its final passage, a majority of all the members of each House, the vote to be taken by yeas and nays and entered in the journal. Now there can be no doubt that each of

these provisions, requiring on the final passage of a bill at least two-fifths or a majority of the votes, as the case may be, of all the members elected to each House, to be taken by yeas and nays and entered in the journal, is mandatory, and unless each of them is complied with the bill is not constitutionally enacted.

This court, in the case of Varney v. Justice, 86 Ky., 601, says in reference to the mandatory character of constitutional provisions: "Whenever the language gives a direction as to the manner of exercising a power, it was intended that the power should be exercised in the manner directed, and in no other manner. It is an instrument of words, granting powers, restraining powers and reserving rights. These words are fundamental words, meaning the thing itself; they breathe no spirit but the spirit to be found in them. To say that these words are directory merely, is to license a violation of the instrument every day and every hour."

Now, as the appropriation to the World's Fair is an appropriation in the sense of the Constitution, the bill, in order to be constitutionally passed, should receive, on its final passage, fifty-one votes in the House, supposing the whole number of members to be one hundred; and twenty in the Senate, supposing the whole number of Senators to be thirty-eight. So the question is, what is the final passage of a bill? And does the final passage of a bill include the adoption of an amendment by either House that is sent to it by the other House? It seems to be clear that the final passage of a bill is the vote by which the bill becomes a law when signed by both Speakers and the Governor; and that this definition includes all amendments there can be no manner of doubt, as one illustration

will show:   Say the House appropriates fifty dollars and
the bill is sent to the Senate for concurrence in the appro-
priation, but it does not concur in that appropriation but
increases it to one hundred dollars and sends it back to
the House for its concurrence in that sum; the bill is not
yet a law; the Senate has refused to concur in the House
bill, but increases the sum and asks the House to concur
in appropriating that sum; unless the House does concur
the bill is not a law; therefore it takes the action of the
House to appropriate one hundred dollars, and it is then
finally passed and becomes a law appropriating one hun-
dred dollars; it is then enrolled as one bill; no amend-
ment appears.   So, to say that the last action of the
House is not the final passage of the bill is clearly a mis-
take.   Such a construction would restore, in full panoply,
the evils that existed under the old Constitution instead
of suppressing them forever; for not less than fifty-one
members of the House could vote away the fifty dollars
of the people's money, but the Senate by amendment
could raise that sum to fifty thousand dollars, and the
House by a mere majority of a quorum could concur in
the amendment, thus defeating and nullifying the pro-
vision *supra*.

The next question is, can the Auditor, conceding his
duty under the bill to be purely ministerial, raise the
question as to the validity of the bill, and be justified in
refusing to issue the warrant?   It seems that when a law
commands an officer to do a certain thing, it is mandatory,
and the officer can not rightfully refuse obedience if the
law is, *prima facie*, regular and valid.   Public policy
requires that this rule be strictly adhered to, for to
allow a ministerial officer to call in question a law, *prima*

*facie* valid, that it is made his duty to execute, would license him to interrupt and defeat the administration of the Government at his pleasure. The clerk of this court, if such principle were tolerated, might refuse to-day to read or sign the orders because, in his opinion, the law requiring him to perform that duty was invalid by reason of some latent infirmity in it.

Mr. Mechem, on Public Officers, sec. 523, states the rule correctly upon this subject as follows: " It is not within the scope of the duties of a ministerial officer to pass upon the validity of laws, instructions or proceedings, *prima facie* valid, and requiring his action. His only duty in such a case is obedience, and, as will be seen hereafter, he can not excuse himself by undertaking to show the unconstitutionality or other invalidity of the law, or the irregularity of the proceedings."

The rule thus announced is fully sustained by the leading cases of the United States, and is eminently conservative. This court has, time and again, recognized the right of the Auditor to resist the mandate of the Legislature upon the ground that it had no constitutional authority to require it, but in all such cases, as admitted by one of the counsel for appellant, the infirmity was suggested by the bill itself. But the question here is unlike any that has been reported. Here, on the one side, is the Auditor—the financial officer of the State—required to pay to the agents of the State certain moneys to be expended in a certain way—not to pay debts or to discharge obligations incurred. No rights of third persons have intervened; but the contest is between the officers as to whether the money should be handed over to be expended in behalf of the State, and the Auditor refuses

Norman, Auditor, v. The Kentucky Board of Managers, &c.

to pay it upon the ground that the bill, although regular and valid upon its face is, on account of the failure to do certain things required by the Constitution, unconstitutional and void. The agents admit, upon demurrer, the facts, and one of their counsel admits in his argument before the court that the bill, by reason of the said non-compliance with the provisions of the Constitution in the particulars pointed out by the Auditor, and as suggested by the Governor in his veto of a similar bill, is unconstitutional and void. So, for us to say to the Auditor that he must pay out the people's money, notwithstanding the bill is unconstitutional and void, and no rights of third parties have intervened making it just and equitable to do so, would be a travesty upon justice and a self-stultification.

All the members of the court agreeing that the bill is unconstitutional, and three agreeing that the Auditor, under the circumstances, has the right to withhold his warrant on that account, the judgment ought to be reversed with directions to dismiss the petition.

JUDGE PRYOR DELIVERED THE FOLLOWING DISSENTING OPINION:

On the 9th of February, 1892, and during the present legislative session, a bill was introduced in the Senate, entitled "A bill to provide for the collection and exhibition of the resources and evidences of the progress of the State of Kentucky at the World's Columbian Exposition of 1893." The bill contained an appropriation of one hundred thousand dollars for that purpose, and placed that sum under the control of a Board of

Managers, who were required to execute a bond for the faithful discharge of their duties, and to draw the money from the Treasury of the State upon the warrant of the Auditor on proper vouchers, first approved by the Governor, &c. The bill passed the Senate in the manner required by the Constitution, and that fact having been announced to the House, that body considered and passed the bill in like manner, with an amendment, and then returned the bill to the Senate where it originated, when that body suspended the rules and concurred in the amendment, but on the amendment no vote was taken by a call of the yeas and nays, and, in so far as appears from the Senate journal, without a majority voting for the bill as amended. The fortieth section of the Constitution provides: "Each House of the General Assembly shall keep and publish daily a journal of its proceedings, and the yeas and nays of the members on any question shall, at the desire of any two of the members elected, be entered on the journal." The forty-sixth section provides: "No bill shall be considered for final passage unless the same has been reported by a committee and printed for the use of the members. Every bill shall be read at length on three different days in each House; but the second and third readings may be dispensed with by a majority of all the members elected to the House in which the bill is pending. But whenever a committee refuses or fails to report a bill submitted to it in a reasonable time, the same may be called up by any member, and be considered in the same manner it would have been considered if it had been reported. No bill shall become a law unless, on its final passage, it receives the votes of at least two-fifths of the members elected to

each House, and a majority of the members voting, the vote to be taken by yeas and nays and entered in the journal: *Provided,* Any act or resolution for the appropriation of money or the creation of debt shall, on its final passage, receive the votes of a majority of all the members elected to each House." It appears, therefore, that the bill, as it originated in the Senate, was passed by the constitutional vote and in the manner prescribed by the Constitution; and when sent to the House the bill, as amended, passed that body as required by the Constitution, but on its return to the Senate, as amended, there was no call of the yeas and nays by that body, but a concurrence only in the amendment, and what the vote was does not appear. Section 56 of the Constitution provides: " No bill shall become a law until the same shall have been signed by the presiding officer of each of the two Houses in open session; and before such officer shall have affixed his signature to any bill, he shall suspend all other business, declare that such bill will now be read, and that he will sign the same to the end that it may become a law. The bill shall then be read at length and compared; and, if correctly enrolled, he shall, in the presence of the House, in open session, and before any other business is entertained, affix his signature, which fact shall be noted in the journal, and the bill immediately sent to the other House. When it reaches the other House, the presiding officer thereof shall immediately suspend all other business, announce the reception of the bill, and the same proceeding shall thereupon be observed in every respect as in the House in which it was first signed. And thereupon the clerk of the latter House shall immediately present the same to the Gover-

nor for his signature and approval." The Governor, on the presentation of a bill to him, after it has received the signature of each Speaker, either approves the bill or returns it, with his objections, to the House in which it originated, or if he fails to return the bill within ten days (Sundays excepted) it becomes a law, unless a legislative adjournment prevents it, and in that event he must disapprove it within ten days after the adjournment by having his veto spread upon the register kept by the Secretary of State. The bill in question was approved by the Governor and has been deposited in the archives of State as the enrolled bill and as the law of the land. I have been thus careful in setting forth these various provisions of the Constitution, as from them originates this litigation between the Auditor and the Board of Managers of this fund appropriated. It is insisted by the one side that by section 46 of the Constitution just quoted, *the final passage of a bill* means the vote on the bill after it has been perfected by amendments or otherwise and in a condition to become a law; that is, *final passage means the last vote on the bill.* On the other hand it is maintained that when a bill has passed either House by a two-fifths vote, or by a majority vote of all the members when money is appropriated, it must be regarded as the final passage of the bill; that is, there can only be one passage of a bill, and that is its final passage, and subsequent amendments, whether formal or substantial, can be adopted by the vote of a majority of a quorum.

The board by its president, H. W. Dulaney, in accordance with the provisions of the bill, presented to the Auditor his vouchers properly approved by the Governor, and demanded a part of the sum appropriated to defray

expenditures connected with Kentucky's exhibit at the World's Fair, and the Auditor refused payment on the ground that the bill was unconstitutional for two reasons : *First,* The bill having been amended by the House, a mere concurrence in the amendment by the Senate, without a call of the yeas and nays, showing that a majority of the Senate voted for the bill as amended, is in violation of section 46 of the Constitution. *Second,* The Legislature had no power, even by a majority vote, to make such an appropriation. The Auditor having challenged in this manner the validity of the bill, the Board of Managers instituted these proceedings in the Franklin Circuit Court for a mandamus requiring him to issue his warrant on the Treasury for the sums specified in the vouchers presented to him. The answer filed by the Auditor sets forth in detail the legislative proceedings as to the manner in which the bill was passed; that the journal of the Senate fails to show the yea and nay vote on the bill as amended by the House, or that a majority of the Senators voted for the bill as amended. A demurrer was sustained to the answer, and the case comes to this court with the admission made by the demurrer, and also, as a matter of fact, that the journals will show that no vote was taken in the Senate by a call of the yeas and nays, on the bill as amended by the House, and nothing on the face of the Senate Journal showing that a majority of the Senate voted for the amendment. It was argued that the Auditor, being a ministerial officer, could not raise the constitutional question as to the manner in which the act passed. It is true that he nor his bondsmen would have been liable if payment had been made, and the act held, as it has been, unconstitutional, but I think it

equally clear, under numerous decisions of this court, that it is not only his right but his duty to contest every claim in regard to which he is required to draw his warrant on the Treasury when, in his opinion, it is not properly verified, or has not been allowed or appropriated according to law. He is the trustee of the State's funds, and to such an extent that not one cent can be drawn from the Treasury without his warrant; and his persistency in refusing to pay this claim not only attests his fidelity and efficiency as an official, but his defense, in which he is sustained by my associates, has saved to the State an expenditure from the Treasury, under a void constitutional enactment, of the sum of one hundred thousand dollars.

I do not believe his defense in response to the petition for a mandamus is available, and shall proceed to give my reasons for dissenting from the principal opinion. I shall assume without any discussion, as the entire questions have been considered in consultation, that the Legislature had the power under the Constitution to pass the bill, and the only objection to its validity as a law is, that the bill *was not passed in the manner* provided by the Constitution. It is contended by my associates that the demurrer, as well as the agreed facts, admit the bill was not passed in conformity to the Constitution, and by this admission the appellees have in some manner deprived themselves of the right to a mandamus. In other words, that a party may come into court, and in a litigation involving the construction of constitutional provisions, by admitting that a bill was not read for the first time or that the yeas and nays were not called as provided by the Constitution, he admits the unconstitutionality of the act,

and will not be heard to say that the journals of either House showing that fact are no evidence as against the enrolled bill.

The appellees only admitted the truth, and if a denial had been made as to what the journals would show in that particular, it would have been false, for they do show that the yeas and nays were not called when the amendment in the House was concurred in by the Senate; therefore the question is, can the journals be introduced as evidence to contradict or to nullify the enrolled bill. It is plain that the constitutionality of an act can not be determined by the admission of a party, and when brought in question where evidence is offered to show the act to be void the highest and best evidence must be adduced, and if the journal of the Senate is incompetent for that purpose, the admission that they are competent would not make them so. Mr. Justice Cooley says the court will not act upon the admission of parties that an act was not passed in accordance with the Constitution. Const. Limit. (6 ed.) page 163 (note). See also Legg v. Mayor of Annapolis, 42 Md., 203, for a discussion of this question.

If the issue had been made by a denial; the Auditor would have offered to introduce the journals, and upon the objection by the appellees as to the competency of the testimony, the identical question would have been made that was raised by the demurrer. If the appellees had not filed a demurrer nor replied to the answer of the Auditor and submitted the case in that condition, the court would have been compelled to hold that the answer constituted no defense. The appellees have done nothing to waive their legal rights. They come into court with a

clear legal right to demand of the Auditor this money,. and it is the Auditor setting up a defense based upon incompetent testimony, which is taken hold of by my associates as evidencing such an unconscientious claim as to justify them in denying a remedy for the enforcement of a clear legal right; and to do this they go back, not at the instance of the appellees, but at the instance of the Auditor, to see whether the journals establish the truth of the facts alleged by the defense—facts the appellees. admit to exist, and admitting the truth in regard to a matter over which they had no control, and that is incompetent testimony for any purpose on this issue, they are denied a remedy to which they would have been entitled but for this incompetent testimony. This is based on the idea that the appellees have no interest in this controversy, and if this be true they have no standing in court, and the case should be dismissed on that ground. I can see nothing in the argument sustaining this view, and it is at last a decision in effect that you may declare a law invalid by reason of the Legislature failing to pass a law in the manner required by the Constitution. And the question arises, is the validity of the act to be determined by the enrolled bill, or by the journals of the Senate showing the manner of its passage? It is contended on the one hand that where the journals show that the Constitution has not been complied with on the passage of a bill the bill is a nullity, and on the other it is argued that the manner of passing bills is exclusively within the province of the Legislature in the exercise of the power conferred by the Constitution, and that when a bill is authenticated in the manner provided by section 56 of the Constitution and promulgated as the law, it is conclusive

evidence of its existence as a law, although the require-
ments of the Constitution as to the manner of its passage
may not have been complied with.   It is not claimed that
the two Speakers can sign a bill either in or out of ses-
sion and have it approved by the Governor, and that this
makes it a law, although it may never have been intro-
duced.   To do this you must impute corruption and fraud
to both Speakers and the executive, a case that would
never arise, and too futile in its suggestions to deserve
notice in an opinion.

Shall the courts, when a bill has been signed by the
Speaker of each House, and declared a law in the pres-
ence of the members of each body, approved by the
Governor and filed in the archives of State as the law
of the land, look to this enrolled bill as conclusive of
the fact that the bill was properly passed, and leave the
co-ordinate branch of the government, whose duty it is
to pass laws, when acting within the scope of its power,
responsible to its constituency for the manner of its
exercise.   The case of the Auditor v. Haycraft, 14 Bush,
284, is relied on by each party as sustaining the view
they respectively present.   The writer of this dissent
wrote the opinion of the court in that case.   The plead-
ings in that case raise no such question, and all the court
said was, that "no inquiry will or can be instituted, as
the case is presented, for the purpose of ascertaining the
manner in which the enactment was passed.   There
has been no pleading filed by the State or Auditor
presenting any such issue, and we must, therefore,
adjudge it was constitutionally enacted, and can not take
judicial notice at the mere suggestion of counsel as to
the votes cast for or against the measure on its final

passage. .* * * If a bill of this character did not receive the vote of a majority of the members, the only mode of reaching the question is by an allegation of fact in an appropriate pleading, and the journals offered as evidence to sustain the defense." This was not done in that case, nor the journals offered so as an objection might be made to them as evidence, and from a casual reading of the opinion it will be seen the question was not decided or discussed. The importance of this question can not be overestimated, and this court is now urged, for the first time in the judicial proceedings of the State by appropriate pleadings, to adjudge an act unconstitutional by reference to the legislative journals, when we have before us the enrolled bill authenticated as the constitution requires. If the validity of the bill was assailed for the want of power on the part of the Legislature to enact it, a judicial question would at once arise, and I would not feel that I was invading the domain of a co-ordinate branch of the government as supreme in its jurisdiction as the judiciary when determining the extent of legislative power. It is manifest that there is a marked distinction between determining a law to be in violation of the Constitution and in adjudging that it has not been passed in the mode required by that instrument.

In defining the powers of government the Constitution gives to the Legislature the sole power to make the laws and to judge of their expediency, and upon the judicial department devolves the duty of interpreting those laws when made; and I can perceive but little necessity for a distribution of the powers of government if the judiciary can be called on to determine, in the

first place, whether an act was passed in accordance with the mode prescribed by the Constitution, and then determine the power of the Legislature to enact the law. This bill has been promulgated by the Legislature with its validity as a law attested by the signature of the Speaker of each House and its approval by the Governor. It may be properly said that judicial opinions from able lawyers and courts as to the power of a court to go behind an enrolled bill, in order to determine the manner of its passage, are such as to cause a doubt as to any conclusion the judicial mind may render on the question; but when the cases decided are carefully analyzed, it will be found the decided weight of authority is, that an enrolled bill, attested as in this case in the manner provided by the Constitution, becomes a perfect law, and its validity can not be questioned, except on the ground the Legislature had no power to enact it. The cases opposed to this view are based, some of them, on the idea that certain provisions of their State constitutions are mandatory and others not, many of them following the earlier cases rendered by the Supreme Court of New York, that have been overruled, and the cases from the Supreme Court of Illinois, that by its recent utterances intimates strongly that the enrolled bill is the best evidence of what is the statute law of the State.

It is difficult to perceive why every provision of a Constitution is not mandatory and to be so applied, unless it is made directory in express terms, and if left open to judicial interpretation as ordinary legislative enactments, then the provision in question becomes either mandatory or directory as it may appear to the mind of the judge called upon to interpret it, and with

such uncertainty there would be no uniformity in the construction of constitutional provisions. Mr. Justice Cooley in his work on Constitutional Limitations says: "But the courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of a Constitution. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims, and fix those unvarying rules by which all departments of the government must at all times shape their conduct, and if it descends to prescribe mere rules of order in unessential matters, it is lowering the proper dignity of such an instrument, and usurping the proper province of ordinary legislation." Regarding, therefore, every provision of a Constitution mandatory, it furnishes no reason for holding that the journals of either House are the best evidence to the courts and the people of the validity of the bill. Some test, however, must be had, and the citizen, *who is presumed to know the law*, must have the means of knowing when a law has been enacted; and while no case reported or unreported in this State is to be found deciding that question, there has in effect been a practical construction as to what constitutes the evidence of the passage of laws, by the manner in which our statutes are published and verified by the enrolled bill. Our statute laws have been embodied for years in what is known as the Revised and General Statutes, and published Acts of the Legislature. When the law, as found in the statute book, is claimed not to be the law enacted by the Legislature, resort is had to the enrolled bill, and I venture the assertion that the able revisers of our statutes and codes of practice never at any time con-

sulted the legislative journals with a view of ascertaining whether the enactments they were publishing as laws to guide the people had been constitutionally passed, and for the reason, the enrolled bill was the best evidence of that fact; and although there has been no decision on the question this raises a strong presumption as to the manner in which such constitutional provisions have been interpreted. What is the evidence upon which this court is asked to pronounce this law unconstitutional? Section 40 of the Constitution provides: "Each House of the General Assembly shall keep and publish daily a journal of its proceedings, and the yeas and nays of the members on any question shall, at the desire of any two of the members elected, be entered on the journal." This journal is kept by the clerk or his assistant; is not signed or required to be signed by any one; its second and third reading dispensed with in almost every instance when a motion is made; it is not required to be attested in any manner whatever. Can it be that the framers of the Constitution contemplated that journals kept in this way are to be regarded as records containing such absolute verity as to be looked into by the courts for the purpose of nullifying a legislative enactment that has been attested and approved in the mode prescribed by section 56 of the organic law? This bill was signed by the presiding officer of each House *in open* session, and before the Speaker signed the bill he suspended all other business; declared that such bill will now be read and he will sign the same to the end that it may become a law; it is then read and compared and found to be correct; he affixes his signature in the presence of the House in open session; and when this is done, to say that such solemn

acts, after the bill has been filed with the Secretary of
State as the law, are to be disregarded by reason of
entries in the legislative journals, "would shake," as
Chief Justice Beasley said in deciding a similar question,
"the stability of all written law to its very foundations."
(Pangborn v. Young, 32 N. J. Law, 37.)

If a court can leave the enrolled bill and search for
evidence in the journals to nullify it, this rule of evidence
would apply not only to the passage of laws enacted since
the present Constitution was adopted, but the manner of
passing every statute since the Constitution of 1849 would
be subjected to judicial investigation; and, whether involv-
ing the right of property, or enacted for the punishment
of crime, with an issue raised as to the manner of its
passage, the court would be compelled to look into the
journals of either House, or allow the litigant to do so, for
the purpose of determining whether or not the enactment
was passed in the mode prescribed by the organic law.
The Constitution of 1849 contains this provision: "No
bill shall have the force of a law until, on three several
days it be read over in each House of the General Assem-
bly, and free discussion allowed thereon, unless, in cases
of emergency, four-fifths of the House where the bill shall
be depending may deem it expedient to dispense with this
rule." If, therefore, the journals of the Legislature, under
the Constitution of 1849–1850, fail to show that the bill
was not read three several days, and the reading had not
been dispensed with, it is not a law; or, if the journals
show affirmatively that the bill was only read two days
and the third reading not dispensed with, the same disas-
trous results must follow; and, according to the majority
opinion, if, under the present Constitution, the Governor

and the House had coincided with the views of the Senate, all the bills where the yeas and nays had not been called on the original bills, or the bills as amended, would necessarily, when assailed, be adjudged null and void, although authenticated as the Constitution required. The published laws are verified by them, and every statutory right becomes endangered when you permit other evidence to show that an enrolled bill is not the law.

The fear of the consequences resulting from such a rule does not alone induce me to regard the enrolled bill conclusive as to the valid passage of a bill. It is because it is a certain and fixed test, and is the highest evidence of what the Legislature has done. The laws embodied in our statutes come from the enrolled bills. All the rights of the citizen derived under statutory enactments depend on the verity of the enrolled bills. Many of the decisions on this question evidence great ability, and with provisions in their Constitutions in many respects similar to ours, they hold, in discussing the right to go back to the journals of either House, that the enrolled bill is conclusive. In the case of Pangborn v. Young, 32 N. J. Law, 37, the court, in speaking of the journals as evidence, said: " In the nature of things they must be constructed out of loose and hasty memoranda, made in the pressure of business and amid the distractions of a numerous assembly. There is required not a single guaranty to their accuracy or to their truth. No one need vouch for them, and it is not enjoined that they should be either approved, copied or recorded." Again: " The Legislature has ⁂ * * adopted a method of certifying its own acts in an authentic form. * * * To the correctness of the present bill, for example, we have the signature of the presid-

ing officer of each House. In its present form it was exhibited to the Governor as the bill which had been enacted, and met his approval. It was then made public by being filed in the office of the Secretary of State. These are the sanctions the Legislature has provided for the authentication of its own acts, both to the public and to the judicial tribunals, and the question is therefore presented, whether such authentication must not be deemed conclusive. This question, in my opinion, must be answered in the affirmative. How can it be otherwise? The body that passes a law must of necessity promulgate it in some form." And, continuing, the court said: "In the frame of our State Government the recipients and organs of this threefold power are the legislative, the executive and the judiciary. They are co-ordinate—in all things equal and independent. Each, within its sphere, is the trusted agent of the public. With what propriety, then, is it claimed that the judicial branch can erect itself into the custodian of the good faith of the legislative department? The proposition is whether, when the Legislature has certified to a mere matter of fact relating to its own conduct and within its own cognizance, the courts of the State are at liberty to inquire into or dispute the veracity of that certificate. I can discover nothing in the provisions of the Constitution, or in the general principles of government, which will justify the assumption of such superior authority."

In the case of State v. Swift, reported in 21 American Reports, 721, from the State of Nevada, where a provision of the State Constitution is analogous to ours, providing "that the reading of a bill by sections on its final passage shall in no case be dispensed with, and the vote

Norman, Auditor, v. The Kentucky Board of Managers, &c.

on the final passage of every bill shall be taken by yeas and nays, to be entered on the journals of each House," etc., the court held that the official copy of a statute duly enrolled and authenticated is conclusive evidence of the law, and the court can not resort to the journals of the Legislature, nor to any other extrinsic evidence to ascertain whether the statute was duly enacted. That court in response to the argument in favor of receiving the journals as evidence said : "The hope of doing good by the course suggested (that is, by correcting mistakes in enrolled bills by the journals) is more than overbalanced by the danger of doing harm, and therefore presents no equivalent for the incalculable disadvantage of reducing the statute law from a state of certainty to one of everlasting doubt." To the same effect is the case of the People v. Devlin, reported in 33 N. Y., 269.

In an opinion delivered by Mr. Justice Harlan of the Supreme Court, and concurred in by his associates, the case of Field v. Clark, reported in 143 U. S., 649, many of the cases on this question were referred to, and in an able and exhaustive discussion of the point involved in that case, the court held: "The signing by the Speaker of the House of Representatives and by the President of the Senate in open session of an enrolled bill, is an official attestation by the two Houses of such bill as one that has passed Congress. It is a declaration by the two Houses, through their presiding officers, to the President, that the bill thus attested has received in due form the sanction of the legislative branch of the Government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And when a bill thus attested receives his approval and

is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable."

In response to the argument that was made in that case, and also urged before us, that some supervision was necessary, otherwise the officers of the respective houses and the members might purposely defeat the popular will, the court said: "But this possibility is too remote to be seriously considered in the present inquiry. * * * Judicial action based upon such a suggestion is forbidden by the respect due to a co-ordinate branch of the Government. The evils that may result from the recognition of the principle that an enrolled act in the custody of the Secretary of State, attested by the signatures of the presiding officers of the two Houses of Congress and the approval of the President, is conclusive evidence that it was passed by Congress according to the forms of the Constitution, would be far less than those that would certainly result from a rule making the validity of congressional enactments depend on the manner in which the journals of the respective Houses are kept by the subordinate officers charged with the duty of keeping them." The court also said, in regard to certain matters expressly required by the Constitution to be entered on the journal: "To what extent the validity of legislative action may be affected by the failure to have those matters entered on the journal, we need not inquire. No such question is presented for determination." It is therefore argued that the precise question presented here was not before the court in Field v. Clark, still it is evident the court was not inclined to recognize the doctrine found in the Illinois and other cases as sound. The provision of the Consti-

tution of Illinois is " that all bills before they can become laws shall be read three several times in each House and shall be passed by a vote of a majority of all the members elect." The Supreme Court of that State, in People v. Starne, 35 Ill., 121, said: " According to the theory of our Legislature, when a bill has become a law, there must be record evidence of every material requirement, from its introduction until it becomes a law, and this evidence is found upon the journals of the two Houses"—the court further saying: " We are not however prepared to say that a different rule might not have subserved the public interest equally well, leaving the Legislature and the executive to guard the public interest in this regard, or to become responsible for its neglect." Mr. Justice Harlan, in reviewing the various decisions on this subject, quoted the language of the Illinois court, in which the soundness of the rule established in that State is questioned, and approved the doctrine of the State courts making the enrolled bill conclusive evidence of the law. The case from the Mississippi Supreme Court of Ex parte Wren, 63 Miss., 512, is also referred to in the case of Field v. Clark, in which Mr. Justice Campbell said, after reviewing the adjudged cases: "Every other view subordinates the Legislature and disregards that co-equal position in one system of the three departments of government. If the validity of every act published as law is to be tested by examining its history, as shown by the journals of the two Houses of the Legislature, there will be an amount of litigation, difficulty and painful uncertainty appalling in its contemplation, and multiplying a hundred fold the uncertainty of the law. * * * If the court may go beyond the enrolled bill and try its validity by the record contained

in the journals it must perform this task as often as called on, and every court must do it. A justice of the peace must do it, and we will have the spectacle of examination of journals by justices of the peace, and statutes declared not to be law as the result of their journalistic history. Let the courts accept as statutes duly enacted. such bills as are declared by the Legislature as their acts, authenticated as such in the prescribed mode.":

In Weeks v. Smith, 81 Maine, 547, it was said: "No man should be required to hunt through the journals of a Legislature to determine whether a statute, properly certified by the Speaker of the House and the President of the Senate, and approved by the Governor, is a statute or not."

It is insisted that sec. 46 of the Constitution, containing the provision that "no bill shall become a law unless, on its final passage, it receives the votes of at least two-fifths of the members elected to each House, the vote to be taken by the yeas and nays on the journals, and a majority of all these members, when an appropriation of money is made," opens the door to an investigation of the journals by the courts. I see no distinction between a provision of a Constitution requiring a call of the yeas and nays by the legislative body upon the final passage of a bill and the provision to the effect that the first reading shall not be dispensed with. They are all mandatory provisions regulating the mode in which the Legislature shall enact laws, the construction of which belongs to the two Houses and the Executive, and not the courts; and especially when the Constitution contains a provision directing the mode of authentication by which the courts and the people are to be governed.

By the statute of our State, to make the deed of a married woman effectual the clerk is required to examine her separately and apart from her husband, and although he may have examined her in the presence of her husband, the courts, by reason of an express statute, will not allow the clerk or the married woman to show that he did not comply with the law when he has certified that he did, in the absence of fraud on the part of the grantee, and for the reason that such a rule of evidence would make the title to land too uncertain; and while the statute as to the clerk is mandatory, just as the provisions of the Constitution in regard to the enactment of laws is mandatory to the Legislature, when the bill is certified or authenticated in the mode required, you can not go behind it. The enrolled bill should be held conclusive. The building may be defective in its construction, but when received from the hands of the architect will be allowed to stand.

Section 56 of the Constitution is plain and unmistakable as to the manner in which a bill is to be authenticated *and promulgated as the law*, and affords the means for every one ascertaining what the law is. When we find an act filed with the Secretary of State, authenticated by the signatures of the Speakers and the approval of the Governor, every citizen can rely on its efficacy, if within the power of the Legislature to enact it, and no evidence of any character assailing its validity should be listened to. It will be found that courts entertaining opposite views on this question are constantly perplexed in their efforts to sustain the validity of laws with a view of preserving rights acquired under statutes, where the mode of passing them was not as prescribed by the Constitution. In the cases of Hall v. Steele, 82 Ala., 562; Glidewell v. Martin, 51

Ark., 559; State v. Allgood, 87 Tenn., 163; State v. Hastings, 24 Minn., 78, and in the courts of Kansas and Colorado, it has been held that the journals may be looked into with a view of assailing the enrolled bill. But when they are silent on the question as to the manner of passing the bill, the court will presume that they were passed in accordance with the Constitution; and in some of the State courts, in order to avoid the disastrous consequences resulting from contradicting the enrolled bill, a legislative estoppel, in some cases, has been applied, to the effect that subsequent legislation in the nature of amendments could avoid legislative enactment.

The highest authority adverse to the rule here recognized is Mr. Justice Cooley in his work on Constitutional Limitations, following the decisions of the courts of his own State. The Supreme Court of that State has gone so far as to hold that where there is no entry on the journals, and no resolution authorizing such entry, an entry found in the bound volume of the House journal will be presumed to have been properly made; two of the judges, Long and Grant, dissenting. (Common Council v. Board of Assessors (Mich.), 51 Northwestern Reporter, 787.)

I can not assent to such a doctrine.

Nor should the bill before us be held unconstitutional upon the idea that no one is injured by a reversal of this case; that it is only one agent of the State government trying to keep the money in the Treasury and another trying to get it out. It is either a law or not a law. If a law, the appellees have the legal right to the money and to compel the Auditor to pay it. There can be no exception to the rule. It is true they are the agents to disburse this fund, but the ears

of the court are not closed to the fact that the managers have been engaged in preparing the exhibits for the World's Fair. They have doubtless expended their own means in making such preparations as were necessary for that purpose. They had the right to act under the law, and the approval by the Governor of their vouchers for twenty-five thousand dollars raises a strong presumption that they have made expenditures. The executive was right in approving the vouchers, because he knew the Board of Managers had acted in good faith. Still, from the majority opinion, if expenditures have been made, as the act was void, it affords them no protection. Can this be? Are the courts of this State to search the journals to find out whether or not statutory rights can be enforced? Such a rule not only makes the forms of legislation but all legislative expediency the subject of judicial approval. It invites the judge from the bench that he may become a partisan to the passage or rejection of bills, where partisan influence and excitement prevail. It is an encroachment upon the exercise of legislative power. Its effect will be to sweep from the statute bills of the highest importance passed during this legislative session, and open the doors to an assault on all past legislation. It is a legal dynamite hidden from the public view, ready when the occasion requires to be used in the destruction of any statute. In the language of a great judge (Judge Black), in an opinion given on a similar question, "I fear to turn loose a principle which might devour the whole statute book." (Attorney-General Opinions.)

While I do not differ from my associates as to what is the final passage of a bill, it is a question that was

not debated by counsel, and, from my view of this case, the opinion at best would only be advisory in its character, and given to a representative body that has not sought it. I again repeat that this court is only determining what evidence we will look to in order to ascertain whether the act in question is or is not a law. It is one entirely distinct from the legislative power in passing bills, or that of the Governor in pointing out defects and constitutional omissions in the attempt to pass them. I feel the importance of a court of last resort concurring on all constitutional questions, but the magnitude of the question involved and the danger, as I conceive, flowing from the construction given the Constitution by my associates, compel me to dissent from their views on the main question involved.