CASE 54—INDICTMENT—MAY 6.

# Hall v. Commonwealth.

APPEAL FROM PIKE CIRCUIT COURT.

1. THE ELECTION OF CIRCUIT JUDGES on the first Tuesday after the first. Monday in November, 1892, was valid, whether or not the act of the Legislature regulating the election of judges at that time was passed in accordance with the provisions of the Constitution. And as the provision of the Constitution directing the election to be held at that time is imperative, it was not necessary that there should be an emergency clause to the act of the Legislature regulating the election.

2. SELF-DEFENSE.—The rule that where one is assaulted in his own castle with a deadly weapon he is not compelled to flee, or to resort to such means of escape as may be apparent, but may stand and defend himself, had no application in this case, as the accused was assaulted in his store, to which persons were invited, and where the deceased, therefore, had a right to be. And, besides, the accused was not. assaulted with a deadly weapon.

J. B. AUXIER FOR APPELLANT.

W. J. HENDRICK, ATTORNEY-GENERAL, FOR APPELLEE.

Record and briefs misplaced.

JUDGE PRYOR DELIVERED THE OPINION OF THE COURT.

At the March term of the Pike Circuit Court for the year 1893, Henry Hall, the appellant, was indicted for the murder of his brother, Randolph Hall, and

the jury who tried the case fixed the punishment at death.

We have seldom read a record of conviction where there were less palliating circumstances in behalf of the accused than this case presents. He filed an affidavit for a continuance on the ground that his brother had threatened to take his life, and had, on more than one occasion, assaulted him—facts that could be established by the absent witnesses who had been summoned. The court refused the continuance and allowed the statements contained in the affidavit as to what these absent witnesses would state, to go to the jury as evidence. On the trial he established, by a number of witnesses who were before the jury, that these threats had been made, as well as the assault upon him, by his deceased brother, with a knife, some time prior to the killing. There can be no doubt that both the brothers, when under the influence of liquor, were violent and bad men, and that when their passions were inflamed by liquor, they respected the rights or feelings of no one, not even their parents, and this murder was the result of a drunken debauch when in a game of cards the one brother had won the money of the other.

There was no one present when the murder took place but the little daughter of the deceased, of the age of twelve years, and a brother of the two men, who were ready to kill each other at any time when drunk, and that brother was so stupefied with whisky as not to be able to give any account of the shooting, except that the shooting aroused him from his stupor, and he saw one brother standing with his

pistol in hand and the other on the floor, shot twice
through the head.    The little girl seems to have
testified with much intelligence, and is corroborated
in many particulars.    She says that her father (the
dead man) and his brother (the accused) were play-
ing cards in the yard or on the ground fronting the
building in which the accused kept a grocery ; that
they were betting on the game, and it commencing
to rain, they left the yard, going into the grocery,
where a cloth was placed on a box and the two re-
newed the game, the accused sitting in a chair and
the deceased on the floor; that her father won one
dollar of the accused, when the latter handed it over
to him, and then pulled his pistol, shooting him
twice in the head.    She heard no quarrel between
them.    The appellant's statement is that he refused
to play with his brother, because he was afraid of
him, and told him that he had heard he had threat-
ened to kill him, when the deceased replied that
they could play and their other brother could keep
the game; that they played until it commenced rain-
ing, when they went into the grocery and did not
play any more ; that the deceased became boisterous,
and he gave him a dollar to leave ; that he put the
dollar in his pocket and then made at him with
something like a knife, threatening to take his life,
and he shot him to protect his own person, believing
that his brother would kill him.

The brother, who seems to have been in a stupid
condition when the shots were fired, says that they
did play in the house, and he went off to sleep.    The
accused also states that the little girl was not present

at the time, but had gone to the spring after water, when it is shown by others that she had brought the water before the rain began to fall.   The deceased, at the time he was shot, had no weapon.   A small barlow knife was found in his pocket unopened, and it is manifest that the murder was the result of a drunken debauch, and that the shooting took place as the little girl s'ates.   If all the threats mentioned in the affidavit had been admitted as true, and many were proven on the trial, the accused was guilty of the awful crime of murdering his own brother, with no excuse whatever.   He was given the benefit of all the law to which he was entitled.   There was an instruction for murder, one for manslaughter, and one that he had the right to defend himself against the assault, if any, made upon him by the deceased.   It is insisted that he was in his own castle when the shooting took place, and that he was not compelled to flee, or to resort to means of escape that were apparent.   Such an instruction should not have been given.   This was a grocery, to which persons were invited.   His brother had the right to be there.   There was no assault upon him with a deadly weapon.   The deceased had only a small knife, and that in his pocket.   The history of the case, as stated by the accused, the jury refused to believe, and in our opinion, after a careful review of the testimony, it was a murder without palliation or excuse.

After the jury had returned its verdict in this case, and when the accused was asked if he had any reason to assign why judgment should not be pronounced against him, he responded by saying : That the judge

then presiding—the Hon. John S. Patton—was not the
Judge of the Pike Circuit Court, for the reason that
the act of the Legislature regulating the election of
circuit judges, &c., in the year 1892, and by virtue
of which the said Patton was elected, and now holds
his office, is unconstitutional and void ; that the re-
quisite constitutional number of votes was not cast
in favor of said law at the time of its passage; that
different amendments were concurred in by the Senate
after it came from the House, and no yeas and nays
entered on the Journal at its passage, as the Constitu-
tion requires, and that no emergency clause was ap-
pended to the bill.

This court in the case of the World's Fair appro-
priation (Norman, Auditor, v. Ky. Board of Managers,
&c., 93 Ky., 537) discussed this question, but in our
opinion the case before us is not to be governed by the
doctrine of the majority opinion in that case. The
Constitution requires that the election of all State offi-
cers shall be held on the first Tuesday after the first
Monday in November, and this court judicially knows
that circuit judges were elected in this State as
provided by the Constitution on Tuesday after the
first Monday in November, 1892, and that John
S. Patton was elected in the district in which he
presides, embracing the county of Pike. This was
a general State election, and directed to be held
by the Constitution, and no emergency clause was
necessary, as the provision of the organic law is im-
perative, and no legislative act could alter its pro-
visions or fix the time for the election on any other
day or year, and the omission of the Legislature to

comply with this constitutional provision will not be allowed to disfranchise the voters of the State, or deprive its citizens or the tribunals created by the Constitution from enforcing the laws of the land. We have for this reason not consulted the Senate Journals on the question made.

Judgment affirmed.

Judge Hazelrigg not sitting.